STATE of Utah, Plaintiff and Appellee,

v.

Larry Ross HARMON, Defendant
and Appellant.

No. 960407.

Supreme Court of Utah.

April 7, 1998.

Jan Graham, Atty. Gen., J. Frederic Voros, Jr., Asst. Atty. Gen., Salt Lake City, and Dexter L. Anderson, Fillmore, for plaintiff.

Edward K. Brass, Salt Lake City, for defendant.

RUSSON, Justice:

## INTRODUCTION

Larry Ross Harmon appeals from a judgment entered on a jury verdict finding him guilty of murder and attempted murder. Harmon alleges that the trial court erred regarding three evidentiary rulings, which prejudiced his case, and that he is therefore entitled to a new trial. We affirm.

## BACKGROUND

On May 22, 1995, Harmon shot Douglas Greer and Raymond Thomas on a road between Fillmore, Utah, and the Frampton Heights development where Harmon lived. Greer died as a result of a bullet wound from Harmon's .45 caliber handgun. Thomas was injured but survived.

The homeowners in the rural Frampton Heights area had an informal "neighborhood watch" system of keeping an eye on one another's properties and investigating the names, license plate numbers, and activities of strangers seen in the area. Harmon, the only year-round resident, participated in the watch and reported suspicious tracks or people to the owners of the five other cabins in Frampton Heights.

At trial, Harmon and Thomas gave conflicting testimony regarding the events leading up to and following the shooting. Harmon testified as follows: He was awakened from a nap by knocking on the front and side doors of his cabin. When he looked outside, he saw two young men, Greer and Thomas, whom he did not know. Thomas was jerking on the side screen door, which was locked from the inside, apparently trying to open it. Harmon watched the two men walk away from the cabin toward a gate exiting his property. The two men then walked back toward his cabin and began looking at one of his automobiles. Harmon called out to them to state their purpose and told them to leave. Without verbally responding, they walked back toward the gate and exited his property. Harmon set out in his truck to check his neighbors' homes and to get more information about the two men and what they were doing in Frampton Heights. After checking the homes and finding nothing amiss, he spotted Greer and Thomas walking along the road leading to Fillmore. He drove past them, parked his truck on the side of the road, got out, and asked them their names and what they wanted. Greer and Thomas did not respond to his questions but continued to approach him with "unfriendly expressions," without heeding his requests that they stop. Greer approached straight on while Thomas circled around to Harmon's side. They continued to approach, even though Harmon was displaying a .45 caliber handgun he had retrieved from his truck. Backed against the door of his truck, Harmon feared for his life inasmuch as the two

men were not responding to his requests to stop advancing, and it appeared that they could disarm him. Thus, in self-defense, he shot Greer once in the face and then turned and rapidly fired at Thomas. After the shooting, Harmon returned to his cabin, called 911 on his cellular phone, and reported that he had shot someone who had been trying to break into his property.

In contrast, Thomas testified as follows: He and Greer were on their way up to Twin Lakes, above Fillmore, when their vehicle became stuck in the mud. After unsuccessfully attempting to free it, they decided to walk back to town. To save time, they took a shortcut down a mountain and found themselves in Frampton Heights. They followed a fence line until they came to Harmon's property, and though neither Greer nor Thomas knew Harmon, they jumped over the fence and entered his property, hoping that the property owner might be able to help them pull their vehicle from the mud. Thomas walked up to the porch of the cabin and knocked on the door. Receiving no answer, he went around to the side door of the cabin and again knocked. When no one responded, he and Greer began walking down the road, away from the cabin. However, Harmon called out to them, and they walked back toward the cabin, believing they could still solicit help. When they were twenty to thirty feet away, Harmon began yelling at them from behind the screen door. Harmon asked them if they were ignorant and couldn't read,[1] and he told them that they were on his property and ordered them to leave. They then left Harmon's property and began walking on the road toward Fillmore. As they were walking, Harmon's truck approached from behind, passed them, and stopped about six or seven feet in front of them. Harmon got out of the truck wielding a .45 caliber handgun. Thomas and Greer stood still. Harmon held out the gun and asked Thomas if he knew what it was. Thomas replied that he did. Harmon then told him that the gun was a .45 and asked Thomas his name. After Thomas responded, Harmon turned and said something to Greer. Thomas heard the hammer go back on the

gun and saw Harmon raise it and shoot Greer in the face from a distance of six to twelve inches. Harmon then pointed the gun at Thomas, asked him if he wanted to get shot, and told him to "take off running." As Thomas was running away, he heard the gun fire and felt a bullet strike his arm. He also heard several more shots and saw dirt flying in front of him.

During the trial, the medical examiner testified that Greer had been shot once in the face at a distance of six to twelve inches from the end of the gun. Thomas's physician indicated that the bullet which struck Thomas entered from the back of his arm and exited out the front. The evidence introduced at trial further indicated that Harmon fired a total of five shots from his gun, which held a maximum of eight rounds.

The jury returned a verdict of guilty on the charges of murder and attempted murder. Harmon appeals his conviction, arguing that the following three errors occurred at trial: first, during cross-examination of Harmon, the prosecutor elicited a statement Harmon had made in a police interview following the shooting which notified the jury that Harmon had invoked his constitutional right to remain silent; second, during direct examination of a deputy who had interviewed Thomas, the prosecutor elicited testimony regarding the deputy's opinion as to Thomas's credibility; and third, Harmon cites six instances of prosecutorial misconduct, wherein the prosecutor repeatedly attempted to "impugn the integrity of defense counsel."

In response to these alleged errors, Harmon moved the trial court to dismiss the charges, to grant a mistrial, to arrest judgment, and to grant a new trial. The court denied these motions. On appeal, Harmon maintains that the trial court erred in denying his motions, that the alleged trial errors prejudiced his case, and that he is therefore entitled to a new trial.

## STANDARD OF REVIEW

■ A trial court has discretion in determining whether to grant or deny a motion for

---

1. Harmon had "no trespassing" signs posted on his property, but he conceded at trial that no signs were visible from the place where Thomas said he and Greer entered Harmon's property.

a new trial, and we will not reverse a trial court's decision absent clear abuse of that discretion. *State v. Wetzel*, 868 P.2d 64, 70 (Utah 1993); *State v. Thomas*, 830 P.2d 243, 245 (Utah 1992).

## ANALYSIS

Harmon first argues that the prosecutor violated Harmon's federal right to due process of law in eliciting evidence that he invoked his *Miranda*[2] rights during a police interview. *See Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976) (holding that use of post-*Miranda* silence for impeachment purposes violates Due Process Clause of Fourteenth Amendment). Such a violation, he argues, was harmful error under *Doyle* and therefore requires reversal. The State, on the other hand, argues that under *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), no *Doyle* violation occurred because the prosecutor did not use Harmon's silence against him.

The record indicates that one of the key issues at trial was whether Harmon shot Thomas while Thomas was advancing on Harmon or running away. Harmon's testimony during direct examination suggested that he fired at Thomas only while Thomas was advancing. To impeach this testimony, the prosecutor on cross-examination sought to "refresh" Harmon's memory of the shooting and his interview with a police officer. The following exchange between the prosecutor and Harmon occurred:

Q [prosecutor]: This dialogue here indicates that Raymond was running away when you shot him. Is your testimony today different [than] that or is it the same as the other times or you just can't remember for sure?

A [Harmon]: It doesn't tell me he was running away but I don't recall.

Q: You heard Detective Kimball's testimony that that tree was about 20 feet away do you recall that testimony?

A: No.

Q: Do you remember how far the tree was away?

A: I don't recall which tree we were talking about. . . .

Q: So you don't know how far that tree was or not?

A: No I don't.

Q: You don't have any evidence or any position that would dispute Detective Kimball's testimony that it was 20 feet away?

A: I don't at this point, like I said, we were re-enacting this and at that time I was so shook up and upset I don't remember most of this.

Q: Okay, go back to that other document that I have given you to Page 9 please?

A: Okay.

Q: I think that we need to lay a little bit of foundation here. . . . Then on the next page, Detective Kimball's second statement on that page he says this. ["]You then turned the gun on [Thomas] and said . . . 'do you want me to shoot you in the face like that too or shoot you in the head or do you want some of that too,' something to that [effect]? He said, 'No.' You said, 'Well, get the "F" out of here.' He said that when he turned and ran, he heard you shoot and he felt the bullet go through his arm and then he said that he heard about three more shots after that. Now does this story somewhat fit what happened or would you disagree with that["] and what was your response?

A [Harmon reading from the interview transcript]: "Well, somewhat, somewhat. *I don't think that I am going to talk any more.*"

Q: Does that refresh your memory at all?

A: Of what?

Q: Of whether or not Raymond was running away from you?

A: No, it does not.

Q: And it is your position today that contrary to anything that was said in the past, Raymond was not running away when you shot him?

A: Not at that point as near as I can recall.

Q: You have no explanation of how Raymond may have been shot then in the arm back to front?

A: I do not.

(Emphasis added.) As soon as Harmon finished testifying, defense counsel moved for a mistrial, noting that he had not objected during Harmon's testimony because he did not want to draw attention to the invocation of Harmon's rights and was not expecting the prosecutor to violate the court's pretrial order suppressing such evidence. The court denied the mistrial motion but offered to give a curative instruction to the jury. However, Harmon elected not to have an instruction given because he did not want to draw further attention to the incident.

In advancing his position on appeal, Harmon relies primarily on *Doyle.* In *Doyle,* the prosecutor attempted to impeach the petitioners' trial testimony by questioning them regarding their post-*Miranda* silence. After their arrest for selling marijuana, the petitioners were given *Miranda* warnings, and they made no post-arrest statements concerning their involvement in the crime. At trial, they maintained that they were framed by a government informant, and the prosecutor, during cross-examination, repeatedly asked them why, if they were innocent, they did not give this explanation to police at the time of their arrest. The trial court overruled defense counsel's objections and allowed the prosecutor to argue the petitioners' post-arrest silence to the jury. Reversing their conviction, the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle,* 426 U.S. at 619, 96 S.Ct. at 2245. Harmon argues that under *Doyle,* the prosecutor violated his right to due process by

eliciting his statement "I don't think that I am going to talk any more."

The Court revisited *Doyle* eleven years later in *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). According to the State, *Greer* controls the case at bar. In *Greer,* the defendant was charged with kidnaping, robbery, and murder. After the defendant gave an exculpatory account of the events in question, the prosecutor asked him on cross-examination, "Why didn't you tell this story to anybody when you got arrested?" *Id.* at 759, 107 S.Ct. at 3105. Defense counsel immediately objected and requested a mistrial. The trial court sustained the objection, denied the mistrial motion, and instructed the jury to ignore the question. The prosecutor did not pursue the issue further or mention it during closing argument. Therefore, the Court concluded, "The fact of [defendant's] postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no Doyle violation occurred in this case." *Id.* at 764–65, 107 S.Ct. at 3108.

The basic principle behind *Doyle* is the " ' "fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." ' " *Greer,* 483 U.S. at 763, 107 S.Ct. at 3107 (quoting *Wainwright v. Greenfield,* 474 U.S. 284, 291, 106 S.Ct. 634, 638, 88 L.Ed.2d 623 (1986) (quoting *South Dakota v. Neville,* 459 U.S. 553, 565, 103 S.Ct. 916, 923, 74 L.Ed.2d 748 (1983))). While the Court in *Greer* recognized that the prosecution's calling attention to the defendant's silence during trial does not comport with due process, the Court noted that *Doyle*'s holding is that "the Due Process Clause bars *'the use for impeachment purposes'* of a defendant's postarrest silence." *Id.* (emphasis added) (quoting *Doyle,* 426 U.S. at 619, 96 S.Ct. at 2245).[3]

---

**3.** Notably, the Court's analysis in *Greer* distinguished the facts in that case from the facts presented in previous cases: "It is significant that in each of the cases in which this Court has applied Doyle, the trial court has permitted specific inquiry or argument respecting the defendant's post-Miranda silence." *Greer,* 483 U.S. at 764, 107 S.Ct. at 3108 (citations omitted). In contrast, the trial court in *Greer* did not permit

the inquiry that *Doyle* forbids. First, the trial court explicitly sustained defense counsel's objection to the question concerning the defendant's post-arrest silence. Second, the court specifically instructed the jury to disregard any questions to which an objection was sustained. And third, no further questioning or argument with respect to the defendant's silence occurred. *Id.*

■ Because the primary purpose behind *Doyle* is to forbid "the use for impeachment purposes" of a defendant's post-arrest silence, the mere mention that a defendant invoked his constitutional rights does not prima facie establish a due process violation. As the Seventh Circuit Court of Appeals has stated:

> *Doyle* and the cases applying the rule against using a defendant's post-arrest silence against him center the constitutional inquiry around *the particular use* to which the post-arrest silence is being put. In other words, we must look at the circumstances in which a criminal defendant's post-arrest silence or request for counsel is revealed in court in order to determine whether the purposes underlying the rule in *Doyle* have been undermined.

*Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir.1991) (emphasis added). Thus, the State must, in some way, use the defendant's silence to undermine the exercise of those rights guaranteed by the Fourteenth Amendment before it can be said that such rights have been violated. If the error is substantial and prejudicial to the extent that there is a reasonable probability that it affected the reliability of the trial outcome, then a new trial is required. *See State v. Lairby*, 699 P.2d 1187, 1205–06 (Utah 1984), *overruled on other grounds by State v. Ossana*, 739 P.2d 628 (Utah 1987); *State v. Wiswell*, 639 P.2d 146, 147 (Utah 1981); *State v. Urias*, 609 P.2d 1326, 1329 (Utah 1980).

We note that our analysis is consistent with cases we decided before *Greer.* For example, in *Lairby*, the defendant claimed that her defense counsel was ineffective in failing to object to prosecution questions regarding her exercise of her constitutional rights to an attorney and to remain silent after *Miranda* warnings had been given to her. This court concluded that there was no reasonable probability that the error affected the reliability of the trial outcome where (1) no repeated efforts occurred to elicit testimony of the defendant's silence, (2) the prosecution did not comment on the defendant's silence in closing argument, (3) the judge gave a curative instruction, and (4) the defendant's extensive testimony offset or dispelled any negative inference regarding her silence. *Lairby*, 699 P.2d at 1205–06. In *State v. Singleton*, 693 P.2d 68 (Utah 1984), a police officer testified that after the defendant had been informed of his *Miranda* rights, the defendant stated that he understood his rights and that he did not have anything to say to the police officers. However, the defendant subsequently volunteered an incriminating statement. This court concluded that the testimony regarding the defendant's initial response to the *Miranda* questions was elicited solely to lay the foundation for the relevant and admissible statement which he subsequently volunteered. The prosecution's examination was not conducted to encourage any inference of guilt from the defendant's silence, and the prosecution did not make further reference or comment at any point in the trial regarding the defendant's initial post-*Miranda* response. *Id.* at 69–70. In *Wiswell*, we held that a *Doyle* violation warranted reversal because the prosecution's *continued attempts* to put the defendant's silence before the jury could have affected the trial result and were therefore prejudicial. 639 P.2d at 147. Finally, in *Urias*, a police officer testified that after informing the defendant of his rights, the defendant exercised his constitutional rights to an attorney and to remain silent. This court concluded that "the prosecutor was having the police officer testify to the circumstances of the arrest and that the information elicited was but a part of the natural sequence of events." 609 P.2d at 1328. While finding the error nonprejudicial, this court also found significant the fact that the prosecutor did not attempt to use the defendant's silence to cast an inference of the defendant's guilt or to persuade the jury to do so. *Id.*

Other jurisdictions have also adhered to a similar analysis. *See, e.g., Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir.1995) ("[M]ere mention of a defendant's request for counsel is not per se prohibited; rather it is the prosecutor's exploitation of a defendant's exercise of his right to silence which is prohibited."); *United States v. Stubbs*, 944 F.2d 828, 835 (11th Cir.1991) ("[A] single mention does not automatically suffice to violate defendant's rights when the government does not specifically and expressly attempt to *use* ... the

improper comment to impeach the defendant." (emphasis added)); *Cook v. State*, 544 N.E.2d 1359, 1363 (Ind.1989) (concluding that no *Doyle* violation occurred where FBI agent made isolated reference to defendant's request for counsel, curative instruction followed, and no specific inquiry or argument respecting defendant's silence was made); *State v. Baccam*, 476 N.W.2d 884, 885–87 (Iowa Ct.App.1991) (finding that trial court did not abuse its discretion in denying mistrial motion where officer testified that defendant "declined to be interviewed," objection was sustained, and defendant declined court's offer to strike answer and admonish jury); *Commonwealth v. Waite*, 422 Mass. 792, 665 N.E.2d 982, 987 (1996) ("The sine qua non of a Doyle violation is the government's use of the defendant's silence against him.").

▮ In the case at bar, while the prosecutor's elicitation of Harmon's statement violated the trial court's order suppressing such evidence, the prosecutor clearly did not use the statement to undermine Harmon's constitutional right to remain silent. In fact, the prosecutor's next question was, "Does that refresh your memory at all? . . . Of whether or not Raymond was running away from you?" It thus appears that Harmon's statement was merely incidentally and inadvertently elicited. Moreover, the prosecutor did not make reference to or inquire further into Harmon's silence on cross-examination or at any other time during the trial, nor did the prosecutor attempt to use Harmon's silence to cast an inference of his guilt or to persuade the jury to do so. *See Urias*, 609 P.2d at 1328. Hence, as in *Greer*, the fact of Harmon's post-arrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference. *Greer*, 483 U.S. at 764–65, 107 S.Ct. at 3108. Because the State did not use Harmon's post-*Miranda* silence against him or undermine his constitutional rights, no *Doyle* violation occurred in this case. Therefore, we conclude that Harmon was not denied a fair trial, because the elicited statement was not

prejudicial to the extent that there is a reasonable probability that in its absence the trial outcome would have been different.[4]

▮ Before turning to Harmon's second argument, we briefly address a recurring issue in Harmon's brief. Harmon argues that at the end of trial, the court found that all errors had been remedied by curative instructions from the court; however, the court gave no instructions to the jury concerning a criminal defendant's invocation of his rights and inferences which may or may not be drawn from his silence. Moreover, relying on "empirical research," Harmon claims that given jurors' strong tendencies to draw negative inferences from a defendant's invocation of rights, instructing the jurors to disregard the invocation would likely have done more harm than good. Our response is twofold. First, during the trial, the court offered to give a curative instruction regarding the elicitation of Harmon's statement. However, for strategic reasons, Harmon declined such an instruction because he did not want to draw the jury's attention to the statement. Because no curative instruction was given, we have no basis for review, and we decline to speculate as to the effect an instruction may or may not have had on the jury. Nevertheless, a curative instruction was not necessary at this juncture, for no *Doyle* violation had occurred. Second, with one minor exception, defense counsel approved the jury instructions as given, thereby affirmatively waiving any objection on appeal. *See State v. Hoffman*, 733 P.2d 502, 504 (Utah 1987) (holding that defendant who failed to preserve objection to jury instructions waived it and may not renew it on appeal); *see also State v. Hales*, 652 P.2d 1290, 1292 (Utah 1982) (defendant's failure to make timely objection, which would have allowed trial court to mitigate any damage caused by prosecutor's comments, precludes review of error).

Harmon's second argument is that he is entitled to a new trial because a deputy

---

4. Harmon also argues that the State must show that the prosecutor's misconduct was harmless beyond a reasonable doubt. *See Greer*, 483 U.S. at 765–67, 107 S.Ct. at 3108–09. Having determined that the prosecutor did not even attempt

to violate *Doyle* by using Harmon's post-*Miranda* silence against him and that the trial result would have been the same in the error's absence, it follows that the elicitation was harmless beyond a reasonable doubt.

police officer testifying at trial commented on the credibility of Raymond Thomas, the State's main witness. During the prosecution's direct examination of the deputy, the following colloquy occurred:

> Q [prosecutor]: During the interview process that you had with Mr. Thomas, did you make observations as to whether or not Raymond was telling you the truth?
>
> [Defense counsel, interjecting]: That question and I would like the benefit of the record later on. That question is so wrong under Utah law that he shouldn't even have asked it and he knows it.

The court sustained the objection and held an off-record sidebar. Thereafter, the prosecutor stated in open court that he would try to ask questions carefully to stay within the court's order, and he continued examining the deputy in the following manner:

> Q [prosecutor]: In the first interview that you had with Raymond Thomas, did he ever indicate to you in that first interview whether or not he had ever knocked on Mr. Harmon's door?
>
> A [deputy]: I don't think. If I recall he didn't indicate either way.
>
> Q: And did you bring that up the second time?
>
> A: Yes, I did.
>
> Q: Who brought that up in the second interview?
>
> A: Without reviewing the record I think I asked him if [he had] ever knocked on the door and he told me that he had at that time.
>
> Q: And when you introduced that to him did you make an observation as to his demeanor, when you brought that up of knocking on the door?
>
> A: Yes, I did.
>
> Q: And what observation did [you] make regarding his demeanor?
>
> A: *Well, as through the whole interview Raymond looked me in the eye and an-*

*swered the questions, I guess in my opinion plausibly.*

(Emphasis added.)

At this point, defense counsel requested a hearing out of the presence of the jury. After the jury had left the courtroom, defense counsel moved for a mistrial on two grounds. First, he argued that the prosecutor elicited from the deputy the very comment that the court had admonished him not to elicit—i.e., the deputy's opinion regarding Thomas's truthfulness. And second, defense counsel argued that the prosecutor's personal attacks against him the day before, when coupled with the deputy's improper comment, had a cumulative effect that denied Harmon his constitutional right to a fair trial.

The prosecutor argued that his question to the deputy regarding Thomas's demeanor was the exact question that defense counsel had approved during the preceding sidebar conference. Defense counsel conceded this point but insisted that the prosecutor elicited the inadmissible statement. Nevertheless, the prosecutor argued that the error was one that could be cured by a jury instruction.

In denying the mistrial motion, the court made three significant findings. First, it found that the deputy's comment unquestionably violated this court's ruling in *State v. Rimmasch,* 775 P.2d 388 (Utah 1989).[5] Second, it concluded that a curative instruction "may" remedy the violation. And third, it found that the prosecutor's conduct on the previous day, especially in light of the court's instructions to the jury, did not have a cumulative effect. After defense counsel told the court that he was comfortable with whatever instructions the court might give to the jury, the court gave the following instruction:

> Members of the jury, the law in the State of Utah is very clear that witnesses are not to comment on the truthfulness of what someone else has said. That is totally and absolutely inappropriate and often results in mistrials or reversals. This witness has made a comment that in his opinion he believed that he was telling the truth[.] He was looking him straight in the eye.

---

**5.** In *Rimmasch,* this court held, in part, that the trial court violated rule 608(a) of the Utah Rules of Evidence in admitting into evidence an ex-

pert's testimony that an alleged child abuse victim had told the truth when she described the alleged abuse to the expert. 775 P.2d at 393.

Didn't get beyond that [on the] subject of Cross Examination. I am telling you you are to disregard that in its entirety and that will be stricken and you are to treat it as though you had never heard it.

The court asked the jury members if they had any questions, and they indicated that they did not.

■ Harmon correctly argues that the deputy's comment violated Utah law. Under Utah Rule of Evidence 608(a)[6] and *Rimmasch,* one witness may not testify as to the credibility of statements made by another person on a particular occasion. *Rimmasch,* 775 P.2d at 392. However, we do not agree with Harmon that *Rimmasch* governs the case at bar. In *Rimmasch,* we stated, "If, in the absence of the evidentiary errors, there is a reasonable likelihood of a more favorable outcome for defendant, we must reverse the conviction." *Id.* at 407 (citation omitted). We applied that standard, however, to the specific circumstances of that case—namely, the erroneous *admission* of evidence.

■ In contrast, at Harmon's trial the improper testimony was never admitted as evidence. Rather, the court ruled that the deputy's comment violated Utah law, ordered the remark stricken, and gave a curative instruction to the jury. Thus the appropriate standard in reviewing the trial court's denial of Harmon's mistrial motion is whether the court abused its discretion. *See State v. Robertson,* 932 P.2d 1219, 1230 (Utah 1997). Under *Robertson,* the trial court must determine whether an incident *may have or probably* influenced the jury to the prejudice of the defendant. *Id.* If the court, in its discretion, concludes that the incident probably did not prejudice the jury, then it should deny the motion. *Id.* at 1230–31. Harmon argues that the deferential *Robertson* standard need not apply because the trial court

did not find that the jury was not prejudiced. We disagree.

While the trial court did not expressly find that the jury was not prejudiced, a review of the court's ruling indicates that it implicitly made that finding. First, the court recognized the serious error that occurred when the deputy testified as to Thomas's credibility. Discussing the comment with counsel after the jury had been excused from the courtroom, the court stated, "I really don't want to try this case again but we have just [trampled] on the ruling in [Rimmasch] without any question in my view." However, while sensitive to *Rimmasch*'s ruling prohibiting the admission of testimony regarding another person's truthfulness, the court stated that it "may" be able to correct the error through a curative instruction. Thus the court elected to deny the mistrial motion "at [that] point and time." Second, the court's admonition to the jury further evidences its implicit finding of nonprejudicial error. Believing the error could be cured, the court gave a forceful, explicit instruction to the jury to disregard the "totally and absolutely inappropriate" comment. The court confirmed its implicit finding at the end of the trial when it concluded that all errors had been effectively cured through its instructions.

■ Harmon again asserts his argument that empirical research confirms the ineffectiveness of curative instructions.[7] However, curative instructions are a settled and necessary feature of our judicial process and one of the most important tools by which a court may remedy errors at trial. *See Hales,* 652 P.2d at 1292 ("A curative instruction is often mentioned by courts as an important consideration in reviewing the constitutionality of prosecutorial comments."). There is rarely a case in which a trial judge is not called upon

---

6. Utah Rule of Evidence 608(a) provides:

 (a) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for

truthfulness has been attacked by opinion or reputation evidence or otherwise.

7. Harmon cites the following two articles to support his argument: J. Alexander Tanford, *Thinking About Elephants: Admonitions, Empirical Research and Legal Policy,* 60 UMKC L.Rev. 645 (1992); J. Alexander Tanford, *The Law and Psychology of Jury Instructions,* 69 Neb.L.Rev. 71 (1990).

272 from such improper

to affirm an attorney's objection and instruct the jury to disregard an improper question or an improper answer a witness has given. Such instructions are curative instructions that trial judges routinely give during the presentation of evidence as well as at the end of trial, before the jury deliberates. If a trial judge could not correct errors as they occur, few trials would be successfully concluded. Moreover, our judicial system greatly relies upon the jury's integrity to uphold the jury oath, including its promise to follow *all* of the judge's instructions. Utah is not alone in utilizing curative instructions; our research indicates that virtually every jurisdiction, both state and federal, relies upon such instructions in curing errors during trial and in reviewing errors on appeal. *See, e.g., United States v. DiSanto*, 86 F.3d 1238, 1249 (1st Cir.1996) (concluding that district court "efficaciously dispelled" any prejudicial effect of improper statement through curative measures); *United States v. Forrester*, 60 F.3d 52, 62 (2d Cir.1995) (stating that in assessing potential prejudice, court must consider, among other things, whether curative instructions effectively protect against prejudice or misuse by jury of evidence); *United States v. Weitzenhoff*, 35 F.3d 1275, 1291 (9th Cir.1994) ("[A] prompt and effective admonishment of counsel or curative instruction from the trial judge may effectively 'neutralize the damage.'" (quoting *United States v. Simtob*, 901 F.2d 799, 806 (9th Cir.1990))); *United States v. Humphrey*, 34 F.3d 551, 556–57 (7th Cir.1994) (stating that when curative instruction is given, court must "'presume[ ] that the jury will follow an instruction to disregard inadmissible evidence unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be "devastating" to the defendant'" (quoting *United States v. Soria*, 965 F.2d 436, 441 (7th Cir.1992))); *United States v. Sepulveda*, 15 F.3d 1161, 1184 (1st Cir.1993) ("[A]ppellate courts inquiring into the effectiveness of a trial judge's curative instructions should start with a presumption that jurors will follow a direct instruction to disregard matters improvidently brought before them."); *United States v. Diaz–Carreon*, 915 F.2d 951, 959 (5th Cir.1990) (concluding that district court's strong curative instruction and condemnation of prosecutor's tactics effectively neutralized damaging effect of improper prosecutorial remarks); *United States v. Walton*, 908 F.2d 1289, 1293 (6th Cir.1990) (concluding that curative instruction was sufficient to cure any harm that may have occurred as result of passing reference to polygraph examination); *United States v. Tyler*, 878 F.2d 753, 762 (3d Cir. 1989) (concluding that case did not present kind of extraordinary situation and inherent risk of prejudice to defendant that required court to disregard presumption that jurors will follow curative instructions given to them); *United States v. Butera*, 677 F.2d 1376, 1383 (11th Cir.1982) ("Prosecutorial misconduct can be considered harmless error where the district court gives an immediate curative instruction, and the evidence of the defendant's guilt is overwhelming."); *see also Robinson v. State*, 600 A.2d 356, 361 (Del.1991) (concluding that admission of evidence was harmless beyond reasonable doubt and that curative instruction was legally effective to cure any error made); *Weeda v. District of Columbia*, 521 A.2d 1156, 1163 (D.C.1987) (stating principle that curative instructions effectively remedy prejudicial effect of irrelevant evidence, improper questions, or inflammatory argument); *Moore v. State*, 669 N.E.2d 733, 741 (Ind. 1996) ("'[I]t must be presumed that the jury are [people] of sense, and that they will obey the admonition of the court when told that they must not permit the reference to the failure of the defendant to testify, to influence their minds.... We do not think that [an improper comment] should, in all cases, have the extreme effect of arresting the cause, and compelling the court to grant a new trial, where reasonable and prompt measures are taken by the court to prevent any injurious effect from such unprofessional and indefensible conduct.'" (quoting *Blume v. State*, 154 Ind. 343, 356, 56 N.E. 771, 776 (1900))); *State v. Winter*, 96 N.J. 640, 477 A.2d 323, 328 (1984) (concluding that record lent no support to suggestion that jurors were unable to comply with court's sharp and complete curative instruction); *State v. Zuern*, 32 Ohio St.3d 56, 512 N.E.2d 585, 590

(1987) ("To assert that the jury was hopelessly prejudiced by the witness' mention of the prior murder arrest, under the facts of this case, would be tantamount to creating a per se rule of exclusion whenever such event occurs, since a stronger case against a defendant could hardly be imagined. Such a conclusion not only undermines the presumption of the effectiveness of the trial court's curative instructions, but it also calls into question the effectiveness of the jurors' oaths."); *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1089–90 (1993) ("In the context of a trial, prompt and effective curative instructions may remove prejudice resulting from improper comments by a prosecutor."); *State v. Tempest*, 651 A.2d 1198, 1207 (R.I. 1995) ("Given the nature of these remarks and the context in which they were made, the trial justice's curative instructions were both timely and effective.").

 This is not to say that curative instructions are a "cure-all." Some errors may be too prejudicial for curative instructions to mitigate their effect, and a new trial may be the only proper remedy. *See, e.g., Wetzel,* 868 P.2d at 69 ("[C]urative instructions are not always sufficient to avoid the potential prejudice to the defendant."); *State v. Auble,* 754 P.2d 935, 937 (Utah 1988) (stating that limiting instructions may not be sufficiently effective to prevent jury from considering evidence which is unfairly prejudicial to defendant); *see also Caldwell v. Mississippi,* 472 U.S. 320, 339, 105 S.Ct. 2633, 2645, 86 L.Ed.2d 231 (1985) (" '[S]ome occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect....' " (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 644, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974))). Nevertheless, the United States Supreme Court has stated, "[W]e normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer,* 483 U.S. at 767 n. 8, 107 S.Ct. at 3109 n. 8 (citations omitted); *see also Arizona v. Washington,* 434 U.S. 497, 522 n. 5, 98 S.Ct. 824, 838 n. 5, 54 L.Ed.2d 717 (1978) (Brennan, J., dissenting) ("[T]he cases are legion in which convictions have been upheld despite the jury's exposure to improper material relating to the defendant's past conduct, often because curative instructions have been found sufficient to dispel any prejudice."). Using the standard set forth in *Greer,* we can review curative instructions on appeal to ensure that the defendant received a fair trial.

 In the case at bar, the trial judge gave several preliminary instructions before trial began, one of which admonished the jury to disregard any evidence which the judge ordered inadmissible.[8] Moreover, as previously noted, the trial judge gave a forceful curative instruction at the time the error occurred. There is nothing to indicate that the jury was unable to follow the court's instruction to disregard the inadmissible evidence that had been inadvertently presented to it. Given the nature of the deputy's opinion—arguably somewhat ambiguous and equivocal—and the absence of any support to the contrary, we cannot conclude that the comment was so prejudicial and devastating to Harmon as to vitiate the mitigating effect of the court's curative instruction.[9]

---

**8.** Instruction 8 reads in pertinent part:

During the progress of the trial certain questions may be asked and certain exhibits may be offered which the court may rule are not admissible into evidence. You must not concern yourselves with the reasons for the rulings, since the production of evidence is strictly controlled by rules of law. You must not consider an exhibit or testimony which the court orders stricken from the record. In fact, such matters [are] to be treated as though you had never heard of [them].

**9.** This court acknowledges that curative instructions are not without defect or limitation. Moreover, we do not discredit the empirical research cited by Justice Durham in her concurring opinion, which may certainly be useful in the judiciary's attempts to improve the judicial system. Nevertheless, the research results which Justice Durham has unqualifiedly accepted should be scrutinized and critically evaluated, for invariably a different study by a different scholar will reach an opposite conclusion. Blind acceptance of such research would be tantamount to accepting an expert witness's testimony without subjecting that expert witness to cross-examination.

In addition to the overwhelming number of state and federal courts which utilize curative

Harmon also claims that the case essentially involved a credibility contest between Harmon and Thomas and that the jury could not resolve the case solely on the physical evidence. We disagree. The record indicates sufficient evidence upon which the jury could have based its verdict. The undisputed facts indicate that Harmon pursued and confronted his victims. Instead of using his cellular phone to report Greer and Thomas to the police, Harmon left his phone at his cabin and took with him his .45 caliber handgun. He then drove his truck past his victims, blocking their passage back to Fillmore. The facts also indicate that Greer was shot in the face at a distance of six to twelve inches from the end of Harmon's gun and that Thomas was shot in the back of his arm.

From these facts alone, the jury was justified in concluding that Harmon was the aggressor and that he did not shoot the victims in self-defense.

Finally, it is significant that the deputy's comment—a single statement within 1460 pages of trial testimony—was not relied upon or referred to again by the prosecutor in any manner during the rest of the trial. This is not to say that a single statement can never be so prejudicial as to ever warrant a mistrial.[10] However, as we stated in *Robertson:*

> Unless a review of the record shows that the court's decision is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have

---

instructions, many scholars and practitioners remain confident that jurors are able to follow a judge's curative instructions. *See, e.g.,* Edward J. Imwinkelried, *Judicial Remedies for the Exposure of the Jury to "Irrelevant" Evidence,* 34 Hous.L.Rev. 73, 81–83 (1997) (recommending that judge give curative instruction to remedy certain errors during trial and asserting that jurors can be trusted to follow them); James W. Gunson, Comment, *Prosecutorial Summation: Where is the Line Between "Personal Opinion" and Proper Argument?,* 46 Me.L.Rev. 241, 258 (1994) ("The primary determining factor with regard to the efficacy of the curative instruction is the force and immediacy of the corrective action."); Charles–Edward Anderson, *Trial by Press?: Pretrial Publicity Doesn't Bias Jurors, Panelists Say,* 76 A.B.A.J. 32 (Sept.1990) (reporting consensus of panelists at The Annenberg Washington Program that jurors subject to extensive publicity can put aside preconceptions if judges provide proper instructions and other curative assistance); 5 Am.Jur.2d *Appellate Review* § 720 (1995) ("Errors occurring at trial generally may be cured or rendered harmless by appropriate instructions, admonitions to the jury, or other curative actions taken by the court or the prosecution. It has been stated that if the trial court gave a prompt curative instruction, it is presumed that the jury followed the instruction unless the record shows otherwise."); Handbook of Fed.Evid. § 103.3 commentary (4th ed. 1996) ("The sufficiency of such a curative instruction must be determined under all the circumstances.... Nevertheless, the giving of a curative instruction is considered sufficient in all but the most aggravated situations, and a mistrial need not be declared.").
Rather than being a "head in the sand approach," as Justice Durham opines, our established procedure is practical and effective in evaluating and resolving real issues and in ensuring that parties receive fair trials. *See, e.g., State v. Wetzel,* 868 P.2d 64, 70 (Utah 1993) (stating

that testimony, while not beneficial to defendant, was not so prejudicial as to impair substantial right, and trial court obviated any error when it struck testimony and ordered jury to disregard it); *State v. Shickles,* 760 P.2d 291, 303 (Utah 1988) (Zimmerman, J., concurring) ("[W]hen a prosecutor makes a remark misstating the law, which may prejudice the jury, the proper procedure is for the trial court to give a clarifying instruction. The prosecutor's statement that if Shickles were found not guilty by reason of insanity he would 'walk out the door' is a technical misstatement of the law and probably required a curative instruction."); *State v. Tillman,* 750 P.2d 546, 555 (Utah 1987) ("In the face of overwhelming evidence of defendant's guilt, together with the fact that the comments were isolated as opposed to extensive and the fact that the trial judge specifically instructed the jury 'that no presumption adverse to [defendant Tillman] is to arise from the mere fact that he does not place himself upon the witness stand,' we do not hesitate in holding any error was harmless beyond a reasonable doubt."); *State v. Peterson,* 722 P.2d 768, 770 (Utah 1986) (finding court gave instructions that lessened prejudicial effect of prosecutorial misconduct); *see also United States v. Cole,* 755 F.2d 748, 769–70 (11th Cir.1985) (finding that court thoroughly and carefully instructed jury on how to treat prosecutor's improper remarks, thereby curing any and all prejudice); *Dipert v. State,* 259 Ind. 260, 262, 286 N.E.2d 405, 407 (1972) ("[A] defendant, through an appropriate channel, such as a curative instruction or statement by the judge, will be entitled to inform the jury of such procedures where an erroneous view of the law on [the] subject has been planted in their minds.").

10. Contrast the experts' testimony in *Rimmasch,* which comprised almost two-thirds of the trial transcript, occupied several trial days, and exerted a "pervasive impact" on the trial. 775 P.2d at 390, 407.

had a fair trial, we will not find that the court's decision was an abuse of discretion. We review such a decision with just deference because of the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings, and this is especially so when what actually occurred is in dispute. *Robertson*, 932 P.2d at 1231 (citation omitted). We therefore conclude that in light of the sequence of events that occurred—defense counsel's immediate request for a hearing, followed by the trial court's order striking the comment and the court's curative instruction to the jury—the trial court did not abuse its discretion in denying Harmon's mistrial motion.

Harmon's third argument is that the prosecutor's repeated attempts to "impugn the integrity of defense counsel" deprived Harmon of his constitutional right to a fair trial and he is therefore entitled to a new trial. Harmon bases his claim of prosecutorial misconduct on the following six instances.

First, during cross-examination of Greer's mother, when defense counsel questioned the mother as to her knowledge of Greer's criminal history, defense counsel elicited testimony that Greer had pleaded guilty to a felony. The prosecutor objected: "Your Honor, he is misrepresenting what the witness testified to. He did not plead guilty to a felony and counsel knows that." Defense counsel, however, was correct, and the prosecutor apologized after he realized he was mistaken. The court notified the jury that the conviction was a third degree felony and that defense counsel made no misrepresentation.

Second, during cross-examination of Thomas, defense counsel asked, "[U]sing your words, didn't you say that you checked four other cabins or not?" The prosecutor objected: "Wait a minute. Counsel has been saying that *he said*. He [Thomas] didn't say *check*, counsel said *check*. That is counsel's word not the witness' word." (Emphasis added.) Defense counsel responded: "[W]hat he is doing . . . is claiming that I am somehow misleading this witness which is again a complete falsehood. All I am doing is reading the questions he was asked at that time and what his answers were. He adopts

that answer you will see and we can finish the answer." The court ruled that the jury could interpret the matter itself and directed questioning to continue.

Third, as defense counsel cross-examined Thomas concerning Thomas's statements to police with respect to how closely he approached Harmon's cabin, the prosecutor accused defense counsel of knowingly "reading a question here and there and every where, picking and choosing for purposes of misleading the witness." Defense counsel responded, "I am getting sick and tired of being accused of misleading witnesses." The court then admonished the prosecutor in the following manner:

> That is not an appropriate statement Mr. Anderson [prosecutor]. . . . It is not appropriate in this court at all. You don't know what [defense counsel] is thinking. [He] is here on Cross Examination. He has the right to Cross Examine in any fashion that he sees fit within certain realms of reasonableness. I don't think he has exceeded that. . . . He is simply defending his client and doing his job.

Fourth, as defense counsel further examined Thomas, the prosecutor accused defense counsel of placing his own interpretation on Thomas's prior statements rather than on the statements themselves. The court corrected the prosecutor: "He hasn't put any interpretation on it. He simply read it." Defense counsel then asked to be heard outside the presence of the jury, the jury was excused, and counsel requested that the charges be dismissed due to the prosecutor's misconduct. The court reprimanded the prosecutor for "impugning [defense counsel's] character when he [was] not out of line." The court found that there was nothing misleading in defense counsel's questioning and admonished the prosecutor to limit his objections to "evidentiary" objections. Although the court denied defense counsel's motion, it cautioned the prosecutor, "You have got to be more careful with your words or we are going to result in a mistrial." At defense counsel's request, the court then gave the following curative instruction to the jury:

[T]here were some statements about misconduct on the part of Mr. Brass [defense counsel] that he was misleading the jury. The court finds that there was absolutely no misleading on the part of Mr. Brass as far as the jury or the witness or any one else was concerned. He has done nothing inappropriate. He may be aggressive but that is a right that he has on Cross Examination to be aggressive and not to be aggressive he would not be doing his job.

Fifth, the prosecutor objected to the relevance of defense counsel's questions to Thomas regarding a job application. The court overruled the objection, stating that the questions may or may not have some value. The prosecutor later withdrew his objection.

Sixth, after the defense called Thomas as a defense witness and questioned him concerning his criminal record, the prosecutor prefaced his cross-examination with the following remark, "Raymond, I don't want to take a lot of time on this but I want to be fair to you because counsel hasn't given you a chance to explain any of this stuff." Defense counsel responded: "That is pretty outrageous. He knows what the rules are. I am not allowed to ask those questions. I would have loved to have him explain it. He knows that ethically it is improper to ask him any more [than] the event." Defense counsel objected to the "running editorial commentary," and the court instructed the prosecutor to refrain from any commentary and to just ask questions.

 Because a trial court is in the best position to determine an alleged error's impact on the proceedings, we will not reverse a trial court's denial of a mistrial motion based on prosecutorial misconduct absent an abuse of discretion. *See State v. Hay,* 859 P.2d 1, 6 (Utah 1993); *see also State v. Gardner,* 789 P.2d 273, 287 (Utah 1989); *State v. Speer,* 750 P.2d 186, 190 (Utah 1988). This standard is met only if " ' "the error is substantial and prejudicial

such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant." ' " *Hay,* 859 P.2d at 7 (quoting *Gardner,* 789 P.2d at 287 (quoting *State v. Tillman,* 750 P.2d 546, 555 (Utah 1987))); *see also Speer,* 750 P.2d at 190. For purposes of determining whether a mistrial should have been granted, our overriding concern is that defendant received a fair trial.[11] *Id.*

 Harmon argues that the prosecutor's repeated efforts to impugn defense counsel's integrity were highly prejudicial given the fact that the jurors from the small town where the case was tried were unacquainted with defense counsel, yet some of them were acquainted with the local prosecutor. We are not persuaded that this small-town jury was biased, either against Harmon or in favor of its local prosecutor. There is no evidence to support such a claim. Moreover, established procedures, such as voir dire and change of venue, are available to protect an accused from local prejudice and to facilitate a fair trial. In the case at bar, addressing the effect the local prosecutor's misconduct had on the jury, the trial judge observed at the conclusion of the trial, "I think if anything happened then, Mr. Brass [defense counsel], you acquired more credibility after it was over with [than] not and Mr. Anderson's [prosecutor's] credibility . . . was now on the line."

Harmon also argues that, at a minimum, the prosecutor's "antics" severely disrupted the flow of information from the witnesses to the jury. Most trials, especially criminal ones, will contain an over-abundance of objections, sidebar conferences, conferences outside the hearing of the jury, and other interruptions. While many defendants might hope for an unimpeded flow of information to the jury, such a wish will probably never be realized in our adversarial system of justice.

This case demonstrates several instances of over-zealous advocacy as well as bad judgment on the part of the prosecutor. Howev-

**11.** Harmon relies on *State v. Span,* 819 P.2d 329 (Utah 1991), to support his argument that the prosecutor's misconduct prejudiced his case. *Span,* decided two years before *Hay,* set forth a two-step "prejudice" test. *See id.* at 335. While

we have adopted the more recent approach in *Hay,* we note that our conclusion in the case at bar would be identical under either the *Hay* standard or the *Span* standard.

er, we are not persuaded that the errors were substantial or prejudicial to the extent that Harmon was denied a fair trial. The trial judge ruled in favor of Harmon in each of the six instances described above. We note that in the first instance, the prosecutor was mistaken as to the facts, and he apologized for raising the objection when he realized he had erred. The second and fifth instances are insignificant. In the third instance, the trial court admonished the prosecutor that his comment was inappropriate, and in the fourth instance, the trial court sternly reprimanded the prosecutor. While the court denied defense counsel's mistrial motion, the court warned that a mistrial may be forthcoming if the prosecutor's misconduct continued. However, the court gave a curative instruction to the jury to the effect that defense counsel had done nothing inappropriate and that he would not be doing his job if he did not aggressively cross-examine witnesses. Finally, in the sixth instance, defense counsel argued the inappropriateness of the prosecutor's commentary, and the court concurred and instructed the prosecutor to simply ask questions.

Our conclusion accords with the trial court's and defense counsel's own observations at trial. To illustrate, defense counsel's second mistrial motion was based on the cumulative effect of the first five instances of prosecutorial misconduct when coupled with the police officer's comment regarding Thomas's credibility. In response to the court's observation that the prosecutor's misconduct had been cleared up and that the jury was not at all persuaded that defense counsel had intentionally tried to mislead anyone, defense counsel replied: "I wanted to be clear on what I said about that, Judge. I think that is cleared up and that is why I haven't asked for this [a mistrial] before." Thus, there is no dispute that the first five instances of alleged misconduct, considered collectively, were not substantial and prejudicial. The sixth instance does not tip the scales in Harmon's favor. Though inappropriate, the prosecutor's introductory commentary was sufficiently negated by defense counsel's own objection and the court's instruction. Moreover, we agree with the trial court that it made "ample clarification" to the jury in the form of curative instructions, and we find no basis in the record to disagree with the court's finding that defense counsel probably acquired more credibility as a result of the prosecutor's misconduct.

In light of the foregoing, we hold that the misconduct was not substantial or prejudicial such that there is a reasonable likelihood the trial outcome would have been more favorable to Harmon in the absence of the error. Therefore, the trial court did not abuse its discretion in denying Harmon's mistrial motion.

Finally, Harmon argues that the cumulative impact of the errors warrants a new trial. Under the cumulative error doctrine, "we will reverse only if 'the cumulative effect of the several errors undermines our confidence ... that a fair trial was had.'" *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (quoting *Whitehead v. American Motors Sales Corp.*, 801 P.2d 920, 928 (Utah 1990)). We have reviewed all of the errors Harmon has raised, as well as any errors we assume may have occurred. Because the errors were properly cured at trial and did not influence the jury to Harmon's prejudice, the cumulative effect of the errors does not undermine our confidence that Harmon received a fair trial.

## CONCLUSION

We conclude that the trial court did not abuse its discretion in denying Harmon's motion for a new trial. We therefore affirm Harmon's convictions.

HOWE, C.J., concurs.

STEWART, J., concurs in the result.

DURHAM, Justice, concurring in the result:

I join the majority's conclusion that the cumulative impact of missteps in this trial did not fundamentally undermine the fairness of the process or the adequacy of the verdict. I write separately, however, to express reservations about the majority opinion's unqualified acceptance of the current state of "received wisdom" regarding the efficacy of curative jury instructions. True, as

the majority notes, "curative instructions are a settled and necessary feature of our judicial process," and their use has been generally approved by many courts, including this court and the United States Supreme Court. My review of some of the literature and empirical evidence cited to us by defendant, however, persuades me that there is a significant likelihood that such approval has been unjustified and that our collective confidence in the curative instruction as a valuable "tool" is not substantiated by reality.

After summarizing more than two decades of research on the question, one commentator observes that the consistency of results makes it "safe to say that the research demonstrates that it is far more likely that admonitions are ineffective than that they work as the courts intend." J. Alexander Tanford, *Thinking About Elephants: Admonitions, Empirical Research and Legal Policy*, 60 UMKC L.Rev. 645, 653 (1992); *see also* J. Alexander Tanford, *The Law and Psychology of Jury Instructions*, 69 Neb.L.Rev. 71 (1990) (containing extensive discussion of empirical research and proposing solutions to the problem of ineffective curative instructions). Similar research results eventually led this court to abandon its historical position on jury instructions regarding eyewitness testimony, *State v. Long*, 721 P.2d 483, 488–92 (Utah 1986), and I believe the time has come for us to reexamine, with the assistance of the trial courts and the litigation bar, our own history of uncritical reliance on curative jury instructions. The suggestions offered by Professor Tanford in the second article cited above are worth consideration:

> First, courts must accept that admonitions do not work and may be counterproductive. The assumption that they are effective by themselves should be replaced with the recognition that instructions interact with the adversary system. The only way in which an admonition might help offset the prejudicial effect of improper evidence is if the parties discuss and explain the problem in their arguments to the jury. Therefore, at the trial level, admonitions should not be given unless requested by an affected party who wants to incorporate it into its argument.

Tanford, *The Law and Psychology of Jury Instructions, supra,* at 107.

The author also suggests that (1) trial judges "screen" requests for admonitions that may be harmful, giving them only if counsel "seems aware of their side effects but wants the instruction as part of a strategy to try to deal with it through education and reasoning with the jurors"; (2) trial judges instruct jurors at the beginning of trial that they will be required to disregard evidence which is successfully objected to and that any reference to a defendant's criminal record may not be considered as evidence of guilt (this because psychological research demonstrates that forewarning about prejudicial information can reduce susceptibility to it); (3) jurors be interrogated about the foregoing rules during voir dire and commit to following them; and (4) appellate courts abandon or modify the "cured error" doctrine and the portion of the procedural default doctrine that forces counsel to request curative instructions or waive the claimed error for appeal purposes. *Id.* at 108–09. Tanford concludes:

> [M]ore meaningful reforms can be made if we concentrate on admonitions and rules of law based on the erroneous assumption that it is possible to prevent misuse of evidence merely with an instruction. At trial, the litigants probably would receive fairer trials if judges stopped using admonitions and, instead, gave preliminary instructions to ignore evidence ruled inadmissible. On appeal, the cured error doctrine should be abandoned because it is based on a faulty premise. The procedural default rule ... should be replaced with one that merely requires [parties] to object. Perhaps most importantly, abandoning the convenient fiction that admonitions work will compel courts to face up to the difficult task of deciding whether to admit evidence that has both probative and prejudicial qualities. Decisions based on empirically correct assumptions about juror behavior may be more difficult, but ultimately will make the jury trial system operate more coherently.

*Id.* at 111.

I do not think the majority opinion's "head

in the sand" approach[1] to the effectiveness of curative instructions contributes to the coherent operation of our system, and I hope that trial counsel and trial courts in Utah will be increasingly sensitive to the complex questions raised by the uncontroverted results of a significant body of empirical research about juror behavior.

ZIMMERMAN, J., concurs in Justice DURHAM'S concurring opinion.

---

1. The majority's footnote nine illustrates my point. The articles cited therein contain no empirical research but merely offer the opinion of their authors that curative instructions remedy trial court errors in some circumstances. In fact, the cited articles point out that curative instructions are not always a sufficient remedy. *See, e.g.,* Edward J. Imwinkelried, *Judicial Remedies for the Exposure of the Jury to "Irrelevant" Evidence,* 34 Hous.L.Rev. 73, 83 (1997) (curative instructions standing alone are unlikely to afford adequate relief when jurors are exposed to some types of irrelevant evidence); James W. Gunson, Comment, *Prosecutorial Summation: Where is the Line Between "Personal Opinion" and Proper Argument?,* 46 Me.L.Rev. 241, 258 (1994) (noting that curative instruction is unlikely to remedy some acts of prosecutorial misconduct because it is doubtful that jurors will follow instructions).