2009 UT App 345

STATE of Utah, Plaintiff and Appellee,

v.

A. Paul SCHWENKE, Defendant
and Appellant.

No. 20070659–CA.

Court of Appeals of Utah.

Nov. 27, 2009.

A. Paul Schwenke, St. George, Appellant Pro Se.

Mark L. Shurtleff, atty. gen., Jeffrey S. Gray, E. Neal Gunnarson, and Charlene Barlow, asst. attys. gen., Salt Lake City, for Appellee.

Before Judges DAVIS, THORNE, and McHUGH.

## OPINION

DAVIS, Judge:

¶ 1 Plaintiff A. Paul Schwenke appeals his conviction for securities fraud. He argues, among other things, that the elements of securities fraud were not proven and that the trial court erred in allowing certain evidence to be presented to the jury. We affirm.

## BACKGROUND [1]

¶ 2 Schwenke created a corporation called American–Dairy.com, Inc. (American–Dairy). The business plan was to get several dairy farms together and form a publicly traded company. Upon meeting the victims here, Schwenke introduced his colleague, Jamis Johnson, as a lawyer and an expert in stocks, but Schwenke did not disclose that Johnson was currently in the midst of disciplinary proceedings before the Utah State Bar for the misappropriation of client funds. As to his own background, Schwenke stated that "he used to be a lawyer, but that he was doing things like this now," never disclosing that he had, in fact, been disbarred from the practice of law. Schwenke encouraged the victims to join in the business plan, exchanging their dairy farm assets for stock in American–Dairy. Schwenke said his plan was to "basically take control of the [victims'] farm, pay off all the debt, and it would become part of [American–Dairy]." Although acknowledging that the American–Dairy stock was not worth anything at the time, Schwenke indicated that he expected the value of the stock to go up once there was an initial public offering, stating that "[t]hat's where the money was going to come from." Schwenke also represented to the victims that he had $10 million in assets to invest in the venture. And although the victims were aware that there was some risk in the undertaking, Schwenke told them that "the risk was fairly low."

¶ 3 The victims eventually completed the transaction via a Stock Purchase/Trade Agreement, which conveyed their dairy farm's assets to American–Dairy. The victims also signed proxy agreements, authorizing Schwenke to vote for them at all shareholder meetings. The victims continued to operate the dairy farm, often paying on the dairy farm's financial obligations, but the dairy farm's assets were now part of American–Dairy.

¶ 4 Shortly after the stock purchase, Schwenke procured an additional 200 cows for the dairy farm, but the cows were ultimately repossessed when Schwenke failed to pay for them. Also in this time frame, Schwenke used the newly acquired dairy farm property as collateral to secure payment of a $30,000 loan on behalf of American–Dairy and a $20,000 obligation of his own.

¶ 5 Eventually, because the victims had to continue to pay expenses for the dairy farm, their available funds were drained and the dairy farm was forced to cease operations. Additionally, Schwenke failed to make payments on the dairy farm's mortgage, and the bank foreclosed on the property.

¶ 6 The State charged Schwenke with one count of securities fraud. A trial was held, and the jury ultimately found Schwenke guilty of the charge. Schwenke was thereafter sentenced to one to fifteen years in prison, this term to run consecutively with the prison term he was currently serving. Schwenke now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 7 Schwenke argues that the stock at issue here does not amount to a security as that term is defined by the Utah Uniform Securities Act. See generally Utah Code Ann. § 61–1–13(ee)(i)(B) (Supp.2009) (defining a "security" to include "stock"). He argues that the trial court erred in submitting the case to the jury because under the economic reality test, the American–Dairy stock was not stock as included in the definition of a security. Whether the trial court applied the appropriate legal standard and correctly interpreted a statute are questions of law, which we review for correctness. See Chen

---

1. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." State v. Gordon, 913 P.2d 350, 351 (Utah 1996).

*v. Stewart,* 2004 UT 82, ¶ 19, 100 P.3d 1177 ("[W]hether the trial court applied the proper legal standard is a question of law that is reviewed for correctness."); *State v. Martinez,* 896 P.2d 38, 39 (Utah Ct.App.1995) ("An appellate court reviews a trial court's statutory interpretation for correctness, according no deference.").

¶ 8 Schwenke also essentially argues that there was insufficient evidence to meet the elements of the statute under which he was convicted.

> In the face of such a challenge, the standard of review is that the evidence and the reasonable inferences which may be drawn therefrom must be viewed in the light most favorable to the jury verdict. A jury conviction is reversed for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.

*State v. Johnson,* 774 P.2d 1141, 1147 (Utah 1989).

¶ 9 Schwenke additionally argues that the admission of several pieces of evidence was improper. Determining questions of relevance and the balancing of probative and prejudicial values are both tasks for which the trial court is granted discretion, and we will reverse the trial court's decision on these matters only when it abuses such discretion. *See State v. Fedorowicz,* 2002 UT 67, ¶ 32, 52 P.3d 1194 ("A trial court has broad discretion in deciding whether evidence is relevant, and we review a trial court's relevance determination for abuse of discretion."); *State v. Miller,* 709 P.2d 350, 353 (Utah 1985) ("[T]he appraisal of the probative and prejudicial value of evidence under Rule 403 is entrusted to the sound discretion of the trial judge; absent extraordinary circumstances, The Court of Appeal will not intervene in its resolution." (internal quotation marks omitted)).

¶ 10 Schwenke raises several other issues. However, "[an appellate court] will not address the merits of an argument that has not been preserved absent either plain error or exceptional circumstances." *Duke v. Graham,* 2007 UT 31, ¶ 28, 158 P.3d 540. Thus, we leave several arguments unaddressed because we determine that they were not preserved for appeal.

## ANALYSIS

### I. Satisfaction of Security Fraud Elements

¶ 11 The statute under which Schwenke was convicted provides as follows:

> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
>
> ... (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading ....

Utah Code Ann. § 61–1–1 (2006). Schwenke argues that the State failed to prove beyond a reasonable doubt elements required by the statute, namely, that there was an "offer, sale, or purchase of any security" and that there was any predicate statement that was misleading due to his alleged omissions, *see id.* We address these elements in turn.

### A. Offer, Sale, or Purchase of a Security

¶ 12 Schwenke argues that there exists in this case no security that was offered, sold, or purchased. Although the statutory definition of the term "security" includes the term "stock," *see id.* § 61–1–13(1)(ee)(i)(B) (Supp.2009), Schwenke argues that, as a matter of law, the American–Dairy stock certificates were not securities. In coming to this conclusion, Schwenke relies on the economic reality test established by the United States Supreme Court. *See generally SEC v. W.J. Howey Co.,* 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (explaining that "[f]orm was disregarded for substance and emphasis was placed upon economic reality" when determining whether there existed an "investment contract" as included in the definition of a security).[2] However, in *Landreth Tim-*

---

**2.** Notwithstanding that Schwenke relies on federal cases in support of his argument on this issue, he argues that it is error for the State to do so in response to his argument. Although these

ber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), the Supreme Court clarified that the economic reality test is not required to be applied in determining whether an instrument constitutes "stock" as included in the definition of a security. Rather, the Court noted that the "economic reality test was designed to determine whether a particular instrument is an 'investment contract,' not whether it fits within *any* of the examples listed in the statutory definition of 'security.'" *Id.* at 691, 105 S.Ct. 2297.[3] The Court also explained that the economic reality test had previously been applied in cases involving "unusual instruments not easily characterized as 'securities,'" not cases where "the instrument involved is traditional stock, plainly within the statutory definition." *Id.* at 690, 105 S.Ct. 2297. Moreover, the Court clarified that it "ha[d] never foreclosed the possibility that stock could be found to be a 'security' simply because it is what it purports to be." *Id.* at 691, 105 S.Ct. 2297. Thus, a court still retains the "ability to hold that an instrument is covered when its characteristics bear out the label." *Id.* Indeed, the Court stated, "Instruments that bear both the name and all of the usual characteristics of stock seem to us to be the clearest case for coverage by the plain language of the definition." *Id.* at 693, 105 S.Ct. 2297; *see also Gould v. Ruefenacht,* 471 U.S. 701, 704, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985) (stating that the *Landreth* holding was that "where an instrument bears the label 'stock' and possesses all of the characteristics typically associated with stock, a court will not be required to look beyond the character of the instrument to the economic substance of the transaction to determine whether the stock is a 'security'" (citation omitted)).

¶ 13 The instrument at issue here bore the title of stock, and we therefore need to determine whether it also possessed the characteristics typically associated with stock. These characteristics are "(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." *Landreth,* 471 U.S. at 697–98, 105 S.Ct. 2297. We are not convinced by Schwenke's argument that the first element does not exist simply because there were no profits or current possibility of profits; this does not foreclose the *right* to receive dividends based on profit. As to the second element, the stock on its face indicates that it is negotiable. Regarding the third element, Schwenke states that there was "no chance" the stock could be pledged or hypothecated because it had no current value; however, that does not mean that such an ability was non-existent, just that it was unlikely to be exercised in the near future. As to the fourth element, voting rights are shown by the proxy agreement the victims executed that allowed Schwenke to vote in their behalf. And finally, the fifth element is satisfied in that the *capacity* to appreciate was present; indeed, this appreciation was the very goal of the transaction. Thus, the stock at issue here had typical characteristics of stock and was within the definition of a security.[4]

---

federal cases are not dispositive when we are interpreting our state's securities legislation, *see State v. Larsen,* 865 P.2d 1355, 1360 (Utah 1993) ("[T]he Utah legislature has not required the courts to interpret the Utah Uniform Securities Act in lockstep with federal decisions."), reliance on federal cases is certainly proper, *see Payable Accounting Corp. v. McKinley,* 667 P.2d 15, 17 (Utah 1983) (discussing that the Utah statute setting forth the definition of a security came from the federal version and stating that "[b]ecause most state blue sky laws and the federal securities acts are similar, states frequently rely on federal case law in interpreting state security acts"). And the State's reliance on federal cases is particularly relevant here where those cases clarify the very doctrine and federal cases that

Schwenke cites. Further, we do not agree with Schwenke that allowing reliance on civil cases to determine what constitutes a security somehow reduces the State's burden to prove its case beyond a reasonable doubt.

3. The only Utah case applying the economic reality test was also determining whether instruments were investment contracts. *See Payable Accounting Corp.,* 667 P.2d at 18–19.

4. Schwenke's one-paragraph argument regarding whether the sale was for value was inadequately briefed, being largely conclusory and lacking any citation to legal authority. We therefore do not address it. *See Angel Investors, LLC v. Garrity,* 2009 UT 40, ¶ 35, 216 P.3d 944.

## B. Predicate Statements

■ ¶ 14 Schwenke argues that the State only alleged omissions on his part but did not establish any predicate statements he made that would be rendered misleading by the omissions. We are not convinced that there was insufficient evidence presented to support that Schwenke made predicate statements that were rendered misleading through his omissions. For example, there was testimony that Schwenke stated "that he used to be a lawyer, but that he was doing things like this now." Combined with Schwenke's omission of the fact that he was no longer an attorney because he had been disbarred, this statement was misleading in that it leads one to believe Schwenke simply left the practice of law because he wanted to do something else.[5]

■ ¶ 15 Additionally, there was evidence presented that would support the determination that Schwenke made untrue statements of material fact in relation to the transaction; and one statement is alone sufficient to satisfy the elements of the statute, see Utah Code Ann. § 61–1–1(2). One of the victims testified that Schwenke stated that "he had about $10 million in assets to invest" in the venture and would "pay off all the debt" of the acquired dairy farms. Yet Schwenke had previously testified that at the time of the transaction, American–Dairy "had no financial documents, no bank accounts, was essentially a paper entity" and that the entity had no assets at all. In addition, the evidence regarding the debt Schwenke incurred shortly after the transaction and his immediate failure to pay his obligations tend to show that Schwenke did not have access to millions of dollars as he had claimed. The evidence is therefore sufficient to support Schwenke's conviction.[6]

## II. Admission of Evidence

■ ¶ 16 Schwenke challenges the admission of several pieces of evidence, arguing that they were "irrelevant, prejudicial, and inflammatory." Specifically, he challenges evidence of the $50,000 loan, evidence of the nonpayment for the additional cows, and evidence regarding initial public offerings. For the following reasons, we disagree that these pieces of evidence should have been excluded.

■ ¶ 17 The Utah Rules of Evidence provide a very broad definition of what evidence is relevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. Further, the question is not whether evidence is prejudicial, but whether it is *unfairly* prejudicial, that is, whether it has " 'an undue tendency to suggest decision on an improper basis.' " *Woods v. Zeluff*, 2007 UT App 84, ¶ 7, 158 P.3d 552 (quoting *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989)). And even if some level of unfair prejudice exists, " '[t]he mere fact that evidence possesses a tendency to suggest a decision upon an improper basis does not require exclusion; evidence may be excluded only if the danger of unfair prejudice *substantially outweighs* the probative value of the proffered evidence.' " *Id.* ¶ 8 (quoting *Maurer*, 770 P.2d at 984).

¶ 18 The pieces of evidence Schwenke challenges meet the definition of relevant evidence and have a high probative value. The evidence of the $50,000 in loans and the nonpayment for the additional cows tended to show that the victims did not retain absolute control of the dairy farm as argued by Schwenke and that Schwenke did not in fact have the millions of dollars in investment assets that he claimed to have, as well as being pertinent to the issue of Schwenke's intent. The evidence regarding initial public offerings was also relevant and probative because it was helpful in determining what facts would have been material under the

---

5. Similarly, the representations and omissions regarding Johnson are sufficient to meet the statutory elements.

6. Furthermore, the jury was also instructed on subsection (3) of the securities fraud statute,

which states that the statute is violated if the person "engage[s] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Utah Code Ann. § 61–1–1(3) (2006).

circumstances, the statute at issue only punishing untrue statements of *material* facts and omissions of *material* facts, *see* Utah Code Ann. § 61–1–1 (2006). And any possibility of unfair prejudice that may conceivably exist regarding these pieces of evidence is small and does not substantially outweigh the probative value of the evidence. Moreover, these types of evidence are certainly not the type of evidence typically excluded as inflammatory. *See State v. Branch,* 743 P.2d 1187, 1189 (Utah 1987) (commenting that the eyewitness testimony at issue "did not have the inflammatory potential found in the sort of evidence typically excluded," and citing in contrast a case supporting the exclusion of gruesome photographs of a crime victim). Therefore, admission of these pieces of evidence was not an abuse of the trial court's discretion.

### III. Preservation of Issues for Appeal

¶ 19 "[I]n order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Brookside Mobile Home Park v. Peebles,* 2002 UT 48, ¶ 14, 48 P.3d 968. To determine whether the trial court had such an opportunity, we consider these three factors: " '(1) the issue must be raised in a timely fashion; (2) the issue must be specifically raised; and (3) a party must introduce supporting evidence or relevant legal authority.' " *Id.* (quoting *Badger v. Brooklyn Canal Co.,* 966 P.2d 844, 847 (Utah 1998)).

¶ 20 Schwenke argues that the State's expert inappropriately gave legal conclusions when he testified that stock is usually held to be a security so long as it has some of the normal characteristics of stock and that the stock at issue had such characteristics. But Schwenke raised no objection contemporaneous with the testimony of which he now complains. Instead, he points to an objection he made that "we're getting to a question that the jury has got to determine." But this objection was in response to witness testimony that there were necessary predicate statements made by Schwenke. And the objection came several transcript pages *before* the testimony of which he now complains. Such an objection is neither timely nor specific enough to give the trial court the opportunity to rule on the issue. Thus, the issue is not preserved for appeal and we do not address it.

¶ 21 Likewise, Schwenke does not show us that his allegations of constitutional violations were adequately preserved for appeal.[7] The transcript pages he cites contain no mention of or allusion to his constitutional rights but, instead, simply contain his objection regarding whether the State had proven the necessary predicate statements for his omissions to be of consequence. And where the trial court did not address these issues when raised in Schwenke's motion to arrest judgment, the motion did not serve to preserve the issues for appeal. *See generally State v. Beason,* 2000 UT App 109, ¶¶ 14–15, 2 P.3d 459 (determining that when a trial court addressed on the merits an issue raised in a motion to arrest judgment, this served as granting relief from the defendant's failure to object at trial).

### CONCLUSION

¶ 22 The trial court did not err in failing to apply the economic reality test in determining whether the instruments at issue here were securities as defined by the Utah Uniform Securities Act. Further, there was sufficient evidence to support the elements required for a conviction of securities fraud. We also determine that the trial court did not abuse its discretion regarding the admission of evidence. Finally, we decline to address the remainder of Schwenke's

---

7. The constitutional issues raised are based on what Schwenke characterizes as the State "creating its own law, rather than applying [the securities fraud statute] as enacted by the legislature." We are not convinced that the State sought conviction under an incorrect version of the statute. We further note that Schwenke makes no claim that the jury was improperly instructed on the requirements of the statute or the pertinent statutory definitions. In fact, the jury instructions set forth the elements of the crime as argued by Schwenke in his brief and provided the appropriate statutory definitions so that the jury could determine whether there existed the offer, sale, or purchase of a security.

arguments because they were not preserved for appeal. We therefore affirm.

¶ 23 WE CONCUR: WILLIAM A. THORNE JR. and CAROLYN B. McHUGH, Judges.