2011 UT App 293

STATE of Utah, Plaintiff and Appellee,

v.

Sitamipa Ulisis TOKI, Defendant and Appellant.

No. 20090383–CA.

Court of Appeals of Utah.

Aug. 25, 2011.

Joan C. Watt, Salt Lake City, for Appellant.

Mark L. Shurtleff and Kris C. Leonard, Salt Lake City, for Appellee.

Before Judges McHUGH, ORME, and CHRISTIANSEN.

## OPINION

ORME, Judge:

¶ 1 Defendant Sitamipa Toki was convicted of discharging a firearm from a vehicle or in the direction of a person, building, or vehicle, with an "in concert" enhancement, see Utah Code Ann. § 76-10-508 (2008),[1] a second-degree felony, and possession of a dangerous weapon by a restricted person, see id. § 76-10-503, a second-degree felony. On appeal, he asks us to reverse his convictions and remand the case for a new trial based on multiple claims of error, the most significant of which concerns expert testimony on De-

fendant's gang affiliation. Defendant also claims error in the trial court's improper references to Defendant having been charged as a "restricted person" and to its handling of an altercation that occurred during the trial. We affirm.

## BACKGROUND

¶ 2 In February 2007, the State charged Defendant with three counts: discharging a firearm in the direction of a building, see id. § 76-10-508; possession of a dangerous weapon by a restricted person, see id. § 76-10-503(2); and aggravated assault, see id. § 76-5-103 (Supp. 2010). In March 2007, the State amended the information, adding David Kamoto and Daniel Maumau as codefendants. At the time of trial, however, Kamoto was the sole codefendant. Defendant filed a motion to sever the possession charge from the other charges. In response, the court severed the "restricted person" element from the possession charge. Defendant also filed a Notice of Alibi. The State gave notice that it intended to present expert testimony from Detective Break Merino regarding "gang recognition, behavior, membership, and conflicts related to the Tongan Crip Gang."

¶ 3 Following a trial in October 2008, Defendant was convicted of possession of a dangerous weapon by a restricted person and unlawful discharge of a weapon, with an "in concert" enhancement. The jury acquitted him of the charge of aggravated assault. The trial court denied Defendant's motion for a new trial, and Defendant appealed.

I. Facts Underlying the Criminal Charges[2]

¶ 4 In the early hours of February 3, 2007, a family party was underway in the carport of a home in Kearns. The carport was enclosed on all sides with a tarp. Myla, her nieces Camilla and Mele, her nephew Magic, her friend Patty, and other family members were at the party and drinking heavily.

---

1. For the convenience of the reader and because the provisions in effect at the pertinent times do not differ—in any way relevant to this appeal—from the statutory provisions currently in effect, we cite to the current version of the Utah Code.

2. On appeal, we recite the facts in the light most favorable to the jury's verdict. See State v. Lee, 2006 UT 5, ¶ 2, 128 P.3d 1179.

Mele left the party around 2:00 a.m., driving Patty's SUV.

¶ 5 Around 4:00 a.m., some of Mele's relatives noticed that she was gone and tried to locate her. A relative later called and told them that he had noticed the missing SUV parked on his street. Myla, Camilla, and Magic left the party around 5:30 a.m. to find the SUV. When they located it, Camilla opened the driver's door, and Camilla and Myla saw Mele and Defendant, whom Camilla recognized and later identified. They were both naked. When Magic saw the couple, he punched Defendant in the face. Defendant got out of the car to confront Magic, and Camilla yelled at Magic to get back in the car. Myla, Camilla, and Magic then returned to the party, and Mele remained with Defendant.

¶ 6 Defendant later called Myla several times and told her that he wanted to come over to apologize. Myla did not want him to come over because of the earlier altercation between Defendant and Magic. Defendant was undeterred. Mele testified that Defendant told her to drive him "to get some of his boys ... just in case [Mele's] family jumped him or just in case anything happened at [Mele's] house." She drove to a Glendale neighborhood where a man later identified as codefendant Kamoto got into the car and spoke with Defendant in Tongan, a language Mele does not understand. Kamoto then got into a silver car with another man. Mele knew these two men as D–Locc and D–Down, and someone had told her they were Defendant's "boys."

¶ 7 Defendant directed Mele to drive to her house; the silver car followed. As Mele pulled into the driveway, Myla was standing on the driveway outside the carport. Defendant got out of the car with a shotgun and walked toward Myla, saying he wanted to apologize and talk to Magic. Myla refused to let him pass. Myla testified that Defendant pointed a gun toward her and told her to move. As Defendant advanced toward her, she backed up toward the carport and yelled, "Magic, he has a gun." Magic and Camilla were in the carport when they heard Myla yell. They saw her backing through the tarp into the carport, followed by Defendant holding a gun. Magic grabbed Camilla and got down on the floor. Magic heard a gunshot a second or two later.

¶ 8 Mele and Myla both saw the silver car arrive shortly after Defendant began approaching Myla. Two men, wearing blue bandannas over their faces and carrying guns, emerged from the car. Myla did not see either man fire his weapon. Mele saw Myla and Defendant go through the tarp opening, heard a shotgun blast in the carport, and then heard multiple shots coming from behind her. She saw D–Locc and D–Down near the silver car, shooting toward the house, and she saw the shots hitting a window. Defendant then ran toward the silver car, and Mele saw him shoot once toward the front of the house. Mele ran after Defendant, yelling at him to leave. As she neared the silver car, Defendant opened the door to get in and the door hit Mele, knocking her down.

¶ 9 Magic heard several shots from outside the carport and kept Camilla on the ground. When the shooting ended, Myla, Magic, and Camilla found several shotgun shells, holes in the front of the house, and Mele lying in the street. Myla punched Mele in the face. Mele then went to the hospital where she gave a written statement to police, claiming that Defendant had raped her. She later admitted that she lied about the rape.

¶ 10 Police found fired and unfired rifle ammunition, 12–gauge shotgun shells, and holes in the front window of the house consistent with a single shotgun blast and two rifle shots. They also found evidence of a shotgun blast on the carport ceiling and a hole in the tarp hanging from the carport.

## II. Additional Trial Testimony

¶ 11 Two witnesses testified that Defendant was at a birthday party in Sugarhouse on February 3, 2007, from 1:30 a.m. to 7:00 a.m. Both witnesses were certain Defendant was present until about 7:00 a.m.

¶ 12 Detective Break Merino testified as an expert on gangs in general and on the Tongan Crip Gang (TCG) in particular. He defined a gang as "two or more people acting in concert ... for the furtherance of a group

or an organization or a gang" and indicated that a "gang" had to be engaged in criminal activity. He identified Defendant, codefendant Kamoto, and Daniel Maumau as members of TCG. He testified about the identifying characteristics of TCG members, such as tattoos, monikers (which he described as street names that members will use "especially if they're out doing crimes"), and common clothing. He testified that TCG members carry a blue bandanna to indicate to other gang members or to the public that they are members of TCG and also to use as a disguise when they are "putting in work." He also testified in broad terms about "our gang problem"; "our problem gangs"; gang activities, particularly criminal activities; his involvement with gangs through the law enforcement units to which he had been assigned; and his investigation of gang crimes.

### III. Facts Related to the Trial Court's References to the Restricted Person Language

¶ 13 Before trial, Defendant's counsel asked that the possession of a dangerous weapon by a restricted person charge be severed from the other charges. Rather than severing the charge, however, the court severed the "restricted person" element from the rest of the charge. In view of this ruling, counsel twice asked the court to remove references to the "restricted person" element from the jury instructions. First, before the court read the preliminary instructions to the jury, the prosecutor requested omission of any language referring to Defendant being "on probation or parole for any felony." Second, after closing arguments, codefendant Kamoto's counsel reminded the court to remove the "by a restricted person" language just before the court disseminated the instructions to the jury. During both discussions, the court readily agreed to remove the identified language.

¶ 14 Nevertheless, the trial court referred to the restricted person language several times, as follows: (1) When he was first talking to the panel of prospective jurors, he stated that "Count 2 is purchase, transfer, possession or use of a firearm by a restricted person," and (2) when he read the prelimi-

nary instructions to the jury before the presentation of evidence, he twice mentioned that Defendant was charged with purchase, transfer, possession, or use of a firearm by a restricted person. In addition, the court neglected to amend Instruction 5, the jury instruction outlining the charges, to remove the "restricted person" language before a copy of the instructions was given to the jury.

¶ 15 During deliberations, the jury sent out a note asking for clarification of the term "restricted person." At that time, Defendant's counsel agreed that the trial court could respond as follows: "Do not concern yourself with the language of 'restricted person.'"

### IV. Facts Related to the Altercation

¶ 16 During the trial, an altercation occurred between the two sets of doors at the entrance to the courtroom, just after the jury had been excused for lunch. The trial court discussed the situation with counsel and ultimately decided to remove from the courtroom several people identified as having a connection to the altercation. When the jury returned, the court issued a cautionary instruction, informing jurors that an altercation had occurred in the hallway but that it did not involve any of the witnesses or parties to these proceedings.

### ISSUES AND STANDARD OF REVIEW

¶ 17 Defendant argues that the trial court erred by (1) repeatedly informing the jury that Defendant was charged with being a restricted person, (2) failing to question the jurors to detect juror bias following the altercation in the hall outside the courtroom, and (3) allowing expert testimony indicating that Defendant was a member of a dangerous gang involved in criminal activity. Defendant contends that the cumulative effect of these errors requires a new trial.

¶ 18 When a trial court errs by inadvertently mischaracterizing the charges pending against a defendant, we will reverse a defendant's conviction only if the error is "substantial and prejudicial in the sense that there is a reasonable likelihood that in its

absence there would have been a more favorable result for the defendant." *State v. Johnson,* 771 P.2d 1071, 1073 (Utah 1989). *See* Utah R.Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). We review questions related to a trial court's ability to control courtroom proceedings and respond to events for abuse of discretion. *See State v. Tueller,* 2001 UT App 317, ¶ 12, 37 P.3d 1180. We review questions related to relevance of testimony and the balancing of probative and prejudicial values for abuse of discretion. *See State v. Schwenke,* 2009 UT App 345, ¶ 9, 222 P.3d 768, *cert. denied,* 230 P.3d 127 (Utah 2010). And "[u]nder the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Gonzales,* 2005 UT 72, ¶ 74, 125 P.3d 878 (omission in original) (citation and internal quotation marks omitted).

## ANALYSIS

### I. The "Restricted Person" References

### A. Invited Error

¶ 19 As an initial matter, we must determine whether Defendant adequately preserved for appeal his claim that the trial court erred by informing the jury that he was being charged as a "restricted person."[3] *See Duke v. Graham,* 2007 UT 31, ¶ 28, 158 P.3d 540 ("We will not address the merits of an argument that has not been preserved absent either plain error or exceptional circumstances."). Defendant states that he preserved this issue by moving to sever the possession charge from the other charges and by subsequent discussions alerting the trial court that it needed to remove any reference to the restricted person language from its instructions. Alternatively, Defen-

dant contends that he is entitled to review based on plain error.

¶ 20 The State argues that Defendant invited the error because Defendant's counsel failed to object to any of the trial court's references and approved both the jury panel and the tainted jury instruction. As a result, the State contends that Defendant is not entitled to review, including review based on plain error. *See Pratt v. Nelson,* 2007 UT 41, ¶ 16, 164 P.3d 366 ("[U]nder the invited error doctrine, we have declined to engage in . . . plain error review when counsel, either by statement or act, affirmatively represented to the [trial] court that he or she had no objection to the [proceedings].") (second and third alterations in original) (citation and internal quotation marks omitted).

¶ 21 The invited error doctrine prohibits parties from "tak[ing] advantage of an error committed at trial when that party led the trial court into committing the error." *Id.* ¶ 17 (citation and internal quotation marks omitted). "Affirmative representations that a party has no objection to the proceedings fall within the scope of the invited error doctrine because such representations reassure the trial court and encourage it to proceed without further consideration of the issues." *Id.* ¶ 18 (citation and internal quotation marks omitted).

¶ 22 The State first contends that Defendant invited the error regarding the trial court's references to the restricted person language during jury selection and the reading of preliminary instructions following the selection of the jury because (1) Defendant's counsel passed the jury for cause and (2) when asked by the court if the eight jurors "represent[ed] the jury as selected[,]" Defendant's counsel responded, "It does, your Honor." The State contends that these acts show that "counsel affirmatively conceded that the reading of the information had not biased the jury."[4] We disagree. Ap-

---

3. The State does not dispute that Defendant preserved the other two issues for appellate review.

4. The State relies on two cases, neither of which supports its position. *See State v. Lee,* 2006 UT 5, ¶ 20, 128 P.3d 1179 (applying the invited error doctrine to a claim that the trial court erred by not removing certain jurors for cause when counsel had approved the jury as selected); *State*

*v. Winfield,* 2006 UT 4, ¶ 17 & n. 3, 128 P.3d 1171 (applying the invited error doctrine to a claim that the court failed to adequately probe prospective jurors for bias when counsel passed the jury for cause). Because we are not considering error in jury composition or a direct claim of juror bias, these cases are not helpful.

proving the jury may prevent counsel from later challenging the composition of the jury, *see State v. Lee,* 2006 UT 5, ¶ 20, 128 P.3d 1179 (concluding that counsel's verbal acceptance of the jury prevented him from later challenging the inclusion of certain jurors). It does not, however, constitute a blanket approval of all prior proceedings.

¶ 23 Regarding the restricted person language included in Instruction 5, the trial court and the attorneys discussed the issue twice—once when the *prosecutor* asked the court to omit any reference to Defendant's probation or parole for a felony, and again when codefendant Kamoto's counsel asked the court to delete references to the "restricted person" language from the jury instructions. During both of those discussions, Defendant's counsel remained silent. The State argues that Defendant's counsel invited the error by remaining silent during those discussions. Specifically, the State contends that Defendant's counsel's silence constituted an "affirmative representation that he approved the reading of the preliminary instructions, including [I]nstruction 5" as is, thus encouraging the court to read the instruction and disseminate it to the jury without deleting the restricted person language.

¶ 24 We do not agree with the State's characterization of the import of counsel's silence. During both discussions, the trial court readily agreed with the request to eliminate the improper references, which was entirely consistent with its pretrial ruling. As a result, Defendant's counsel's silence indicates his agreement with the tenor of the discussion, that is, it tends to suggest his concurrence with the request to remove the improper language. After the first discussion, he subsequently agreed to the instructions, but in the context of the previous discussion it is clear that counsel was approving those instructions as the court had already agreed to amend them, i.e., with omission of the improper language. Similarly, during the second discussion, Defendant's counsel's silence indicates his implicit agreement with the consensus that the improper language be eliminated.

¶ 25 More significantly, we do not agree with the State that Defendant's counsel's silence during the two discussions regarding the restricted person language invited any error related to that language. The invited error doctrine requires an affirmative act. *See Pratt,* 2007 UT 41, ¶ 18, 164 P.3d 366 ("Invited [e]rror [g]enerally [r]equires an [a]ffirmative [r]epresentation to the [c]ourt."). The record does not support the State's argument that Defendant acted affirmatively to lead the trial court into error. Because the court had agreed in both situations to remove the improper language, it was simply unnecessary for Defendant's counsel to raise any objections or weigh in on the discussion. In neither situation does counsel's silence rise to the level of an affirmative act that should prevent Defendant from challenging the court's subsequent failure to omit the language from the instructions as agreed. Accordingly, it does not constitute invited error, and we conclude that Defendant adequately preserved this issue.

**B.  The Trial Court's References to the Restricted Person Language**

¶ 26 As noted above, the trial court verbally referred to the restricted person language during jury selection and when the court read Instruction 5 to the jury. In addition, the court neglected to amend the written version of Instruction 5. As a result, the unamended instruction with its references to a "restricted person" was provided to the jury. During deliberations, the jury asked the court for "clarification on 'restricted person.'" The court, with the agreement of all counsel, responded to the jurors' inquiry by telling them not to concern themselves with the "restricted person" phrase.

¶ 27 Defendant argues that the trial court's references to the restricted person language deprived him of his due process right to a fair trial. Specifically, Defendant contends that the court's references "ensured that the jury heard and digested the improper information" and that the jury was aware that Defendant was accused of being a restricted person "from the beginning of this trial, before the [S]tate presented any evidence." Defendant also contends that the court's attempt to cure the inadvertent references was ineffective and "actually magnified the prob-

lem by letting the jury know that another element existed" and, in conjunction with the evidence that Defendant belonged to a "dangerous gang that used guns and was involved in criminal activity," led the jury to speculate that Defendant was unable to possess a firearm because of a criminal past.

¶ 28 Defendant also contends that the improper references were not harmless based on the prejudicial nature of the information, the fact that this type of error is presumed prejudicial and that cautionary instructions following an error of this nature are different from errors involving "elements instructions" where courts can presume that juries will follow instructions, and the fact that the State's case was weak because of credibility problems with several of its witnesses. In particular, regarding the witness credibility concerns, Defendant contends that "information that [Defendant] had been charged as a restricted person had the tendency to influence the outcome, making the jury more likely to convict for possession and discharging a firearm even though the family members were not compelling witnesses." Therefore, Defendant asks us to reverse his conviction and remand for retrial. The State responds that Defendant's claim of error fails for lack of demonstrated prejudice because the trial court cured any possible confusion or prejudice caused by the references to the restricted person language when it directed the jury to disregard the information.

¶ 29 Defendant first contends that we should presume that the references to the restricted person language were prejudicial. In support, he relies on *State v. Saunders*, 699 P.2d 738 (Utah 1985), stating that *Saunders* has "precluded this type of information from going to the jury for over twenty years." In *Saunders*, the Court said the

defendant's status as a prison inmate was relevant to the charge of possession by a restricted person but not relevant to other charges, "except to show a criminal disposition as the basis for an inference that he was guilty." *Id.* at 741. The Court stated that, due to the tendency of the factfinder to convict based on bad character rather than guilt, such evidence is presumed to be prejudicial. *See id.*

¶ 30 *Saunders* involved the court's denial of a motion to sever the prejudicial claim from the other claims against the defendant. *See id.* (stating that "joinder of the offense of possession of a firearm by a restricted person with the offenses of burglary and theft was unduly prejudicial to defendant"). As a result, the *Saunders* jury was exposed to evidence throughout the trial regarding the defendant's status as an inmate, thus "clearly impl[ying] that [the] defendant had committed a prior crime." *Id.* In contrast, here the trial court made inadvertent verbal references to the restricted person language and disseminated a single unamended instruction to the jury.[5] In marked contrast to *Saunders*, this case did not involve the presentation of evidence regarding Defendant's status as a restricted person, nor did the prosecution take advantage of the court's inadvertent references to the improper language or even mention the "restricted person" element.[6] Accordingly, we decline Defendant's invitation to presume prejudice here.

¶ 31 Before the trial began, the trial court implicitly recognized that the jury should not be informed that Defendant had been charged with being a restricted person when it decided to sever the "restricted person" element from the remainder of the possession charge. The court also agreed that the jury instructions should not refer to the restricted person language. It amended the

---

5. In weighing the magnitude of the trial court's error, consideration of two prior cases is instructive. *Compare State v. Harmon*, 956 P.2d 262, 273 (Utah 1998) (holding that the trial court's curative instruction adequately mitigated the admittedly improper testimony at issue, a deputy's single comment on the credibility of another witness), *with State v. Rimmasch*, 775 P.2d 388, 390, 407 (Utah 1989) (holding that the trial court erred by admitting into evidence an expert's testimony regarding credibility of a victim, where

the testimony at issue comprised almost two-thirds of the trial transcript, occupied several trial days, and exerted a "pervasive impact" on the trial).

6. Indeed, as previously noted, on one occasion it was the prosecutor who reminded the court to excise a reference to the restricted person language. *See supra* ¶ 23.

other instructions consistent with this intention, and its failure to amend Instruction 5 was clearly inadvertent.

¶ 32 The unamended Instruction 5 comprised the jury's most significant exposure to the improper language and the jury's query indicated that it did not go unnoticed. Nevertheless, the jury's question indicates that it did not understand the reference in Instruction 5 to "restricted person," which would have struck them as coming out of nowhere, thus undermining Defendant's argument that the improper references had "necessarily tainted" the jury's deliberations from the beginning. The trial court then instructed the jury to disregard the "restricted person" reference, which would have seemed eminently logical to the jurors and ended their concern about the mysterious term.

■ ¶ 33 Defendant contends that the trial court's cautionary instruction was ineffective to cure the error and that cautionary instructions following an error of this nature are different from errors involving elements instructions,[7] where courts can assume that juries will follow instructions. "[C]urative instructions are a settled and necessary feature of our judicial process and one of the most important tools by which a court may remedy errors at trial." *State v. Harmon*, 956 P.2d 262, 271 (Utah 1998). "If a trial judge could not correct errors as they occur, few trials would be successfully concluded. Moreover, our judicial system greatly relies upon the jury's integrity to uphold the jury oath, including its promise to follow *all* of the judge's instructions." *Id.* at 272 (emphasis in original).

■■ ¶ 34 We recognize that "[s]ome errors may be too prejudicial for curative instructions to mitigate their effect." *Id.* at 273 (citing cases supporting this proposition). This is not such a case. The trial court gave a brief, to-the-point instruction to the jury to disregard the "restricted person" reference

in Instruction 5. Defendant has pointed to nothing unusual about the subsequent verdict that leads us to question the assumption that the jurors conscientiously followed the court's instructions to disregard the improper references, nor does anything in the record indicate that the jury was unwilling to follow the court's instruction. "In the absence of the appearance of something persuasive to the contrary, we assume that the jurors were conscientious in performing ... their duty, and that they followed the instructions of the court." · *State v. Burk*, 839 P.2d 880, 883 (Utah Ct.App.1992) (citation and internal quotation marks omitted), *cert. denied*, 853 P.2d 897 (Utah 1993). By all appearances, the jury took its responsibilities seriously. Rather than returning a blanket verdict for the prosecution, it acquitted codefendant Kamoto of all charges and also acquitted Defendant of aggravated assault, the most serious charge against him. These verdicts indicate that the jury was not improperly influenced by the court's inadvertent references to the restricted person language and that the trial court's instruction to the jurors not to concern themselves with the "restricted person" reference in Instruction 5 remedied the court's stray references to the restricted person language. Accordingly, we cannot conclude that the few inadvertent references to the restricted person language in this case were "so prejudicial and devastating ... as to vitiate the mitigating effect of the court's curative instruction." *Harmon*, 956 P.2d at 273. In sum, we see no prejudice as a result of the court's inadvertent references to the restricted person language.

## II. The Altercation

¶ 35 Defendant next argues that the trial court erred by failing to question jurors regarding potential juror bias arising from an altercation that occurred in the entrance to the courtroom during a recess. Defendant contends that the potential for prejudice was significant, and thus, the court's refusal

---

7. Defendant has presented no authority supporting his point that cautionary instructions must be limited to correcting elements instructions, and indeed, numerous cases have addressed the proper use of cautionary instructions to correct other types of error. *See, e.g.*, *Arizona v. Washington*, 434 U.S. 497, 521 n. 5, 98 S.Ct. 824, 54

L.Ed.2d 717 (1978) (Marshall, J., dissenting) ("[T]he cases are legion in which convictions have been upheld despite the jury's exposure to improper material relating to the defendant's past conduct, often because curative instructions have been found sufficient to dispel any prejudice.").

to question the jurors undermined Defendant's right to a fair trial. He states that the jurors could have heard or seen the altercation, that the altercation could have adversely affected the jury by suggesting gang involvement, and that the court's curative instruction not only failed to remedy the potential for prejudice, but heightened the possibility of prejudice by suggesting that "gang members aligned with either [Defendant, his codefendant,] or the witnesses" were involved.

¶ 36 The altercation occurred after the jury was excused for lunch on the second day of trial. The trial court recognized the potential problem and, after the recess, asked counsel and the bailiff for more information. The prosecuting attorney stated that she understood that some of the jurors were coming out of the bathroom and "may have been aware that there was something going on." The attorneys stated that it was loud and sounded like a fight, with yelling, screaming, and crashing noises. The bailiff reported that none of the jurors had said anything about seeing or hearing an altercation. Defendant's counsel then asked the court to question the jurors to determine if they had been prejudiced by the incident. The court noted that no witnesses or parties were involved in the altercation. The court also considered whether questioning the jury would alert them to an issue that they might not otherwise have been aware of. Ultimately, the court decided to give the jury a cautionary instruction, as requested by codefendant Kamoto's counsel, and to exclude some people from the courtroom but allow other people who had clearly not been involved in the altercation to remain. Defendant's counsel objected.

¶ 37 When the jury returned from the lunch recess, the trial court advised them as follows:

> [W]e had an altercation in the hallway outside of our courtroom over the lunch recess[.] I don't know if any of you overheard it or not, it didn't involve any of the witnesses or the parties in this particular case. And I wanted to advise you of that and simply let you know that it didn't

involve people who are central, in terms of this case.

■■■ ¶ 38 As Defendant points out, the right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment; therefore, "[c]ourts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Estelle v. Williams*, 425 U.S. 501, 503–04, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Here, the two defense attorneys made conflicting requests for handling the potential effects of the altercation. Defendant's counsel asked the court to question the jurors regarding their observations and whether they could still be fair and impartial. Codefendant Kamoto's counsel suggested a cautionary instruction.

■■■ ¶ 39 The trial court and counsel discussed, among other things, the possibility that questioning the jurors might make the altercation seem more significant in the jurors' minds. Perhaps aware of this possibility, the court chose an understated response to the altercation and provided a cautionary instruction. We cannot say, even with the benefit of hindsight, that it would have been better had the court questioned the members of the jury individually.

■■■ ¶ 40 A trial court has broad discretion to respond to courtroom events and to control the proceedings before it. *See State v. Tueller*, 2001 UT App 317, ¶ 12, 37 P.3d 1180. Defendant has pointed to nothing specific that leads us to question the trial court's decision to provide a cautionary instruction rather than to interview individual jurors. Thus, Defendant has failed to show that the court abused its discretion when it chose to address the altercation by giving the jury a curative instruction.

### III. The Expert Witness Testimony

¶ 41 Defendant next argues that the trial court erred by allowing testimony from Detective Break Merino, an expert on gangs, because much of the testimony was not relevant to establishing the crimes charged or that Defendant acted in concert with Kamoto and Maumau. Defendant also contends that the prejudicial effect of the testimony sub-

stantially outweighed what little probative value it had because Merino's testimony about gangs and the TCG provided extensive evidence that the TCG and, by extension, Defendant were involved in criminal activity. As a result, Defendant insists, the evidence allowed the jury to convict Defendant merely for being a gang member.

¶ 42 The State responds that the evidence was necessary to establish the identity of codefendant Kamoto and the "in concert" element of the possession charge, given Defendant's alibi evidence and the credibility issues with the State's witnesses. Mele provided the only evidence tying Defendant to Kamoto and Maumau, the other two actors in the shooting incident. She identified Kamoto as one of the shooters and also identified Kamoto and Maumau as members of TCG and as Defendant's "boys." However, the record was replete with evidence that Mele was intoxicated and continued to drink throughout the night. She also admitted that she had lied to her family and to the police about Defendant raping her. Based on this evidence, the jury could reasonably have decided not to believe her testimony. If the jury also disbelieved Defendant's alibi, i.e., that he spent the night attending a birthday party at another location, then Merino's testimony regarding Kamoto's identity and the fact that Defendant, Kamoto, and Maumau were TCG members provided the only evidentiary link between Defendant, Kamoto, and Maumau that could establish the "in concert" element.

¶ 43 The Utah Rules of Evidence provide that relevant evidence is generally admissible. *See* Utah R. Evid. 401 (stating that evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). "[T]he standard for determining the relevancy of evidence is very low, and even evidence with the slightest probative value is relevant." *State v. Martin*, 2002 UT 34, ¶ 34, 44 P.3d 805 (citation and internal quotation marks omitted).

¶ 44 Relevant evidence is inadmissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice." Utah R. Evid. 403. Evidence is unfairly prejudicial

> if it has a tendency to influence the outcome of the trial by improper means, or if it appeals to the jury's sympathies, or arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions of the case.

*State v. Burk*, 839 P.2d 880, 883 (Utah Ct. App.1992) (citation omitted), *cert. denied*, 853 P.2d 897 (Utah 1993). A trial court has discretion to determine questions of relevance and the balancing of probative and prejudicial values, and "we will reverse the trial court's decision on these matters only when it abuses such discretion." *State v. Schwenke*, 2009 UT App 345, ¶ 9, 222 P.3d 768, *cert. denied*, 230 P.3d 127 (Utah 2010). Moreover, we will not overturn a jury verdict based on erroneous admission of evidence unless the defendant has been prejudiced as a result. *See State v. Johnson*, 2007 UT App 184, ¶ 34, 163 P.3d 695, *cert. denied*, 186 P.3d 347 (Utah 2007).

¶ 45 A great deal of Merino's testimony was clearly irrelevant to the charged offenses, particularly Merino's gratuitous statements about "our gang problem," criminal activities of gangs, and his investigation of gang crimes. The trial court should have required the State to focus his testimony on establishing the "in concert" element and Kamoto's identity. *See, e.g., State v. Milligan*, 2010 UT App 152U, para. 6, 2010 WL 2311852 (mem.), *cert. denied*, 238 P.3d 443 (Utah 2010) (noting that the trial court did not abuse its discretion where "the court limited the presentation of gang evidence, giving the prosecutor only 'a little leeway' in mentioning the gang-related evidence, admonishing the prosecutor 'not to overplay this more than is necessary,' and instructing the prosecutor to not 'go too far' "). Moreover, we agree with Defendant that some of the testimony was clearly more prejudicial

than probative.[8] Indeed, using the rubric of rule 403, portions of Merino's testimony can be characterized as having a probative value that is "substantially outweighed by the danger of unfair prejudice." Utah R. Evid. 403. Nevertheless, the central thrust of the testimony was appropriate. If, as noted above, the jury disbelieved Defendant's alibi and also questioned Mele's credibility given her level of intoxication and false accusation, the only evidence that Defendant, Kamoto, and Maumau acted in concert, rather than by odd coincidence, was Merino's testimony regarding their shared gang affiliation. Thus, this key part of Merino's testimony was highly probative of an essential element of one of the charges, as well as of Kamoto's identification. Given the highly probative nature of this evidence, we agree with the trial court that it was not *unfairly* prejudicial. *See Woods v. Zeluff*, 2007 UT App 84, ¶ 7, 158 P.3d 552 (stating that it is not the existence of prejudice but the danger of unfair prejudice that determines admissibility).

¶ 46 We have acknowledged that much of Merino's testimony was irrelevant and that some of it was both gratuitous and unfairly prejudicial. The trial court erred by admitting that part of his testimony and by failing to control the scope of the testimony when it exceeded appropriate limits. But we will not overturn a jury verdict for the admission of improper evidence "if the admission of the evidence did not reasonably [a]ffect the likelihood of a different verdict." *Johnson*, 2007 UT App 184, ¶ 34, 163 P.3d 695 (alteration in original) (citation and internal quotation marks omitted).

¶ 47 We note that the prosecutor did not take unfair advantage of the gang-related testimony in presenting the State's case or in closing argument. Instead, she expressly told the jury not to base a conviction on gang membership, explaining that gang member-ship was only "important . . . because it goes toward [Kamoto's] identification . . . [and] because it shows he's acting in concert." We also note that the improper evidence was admitted with respect to both Defendant and his codefendant, yet the jury acquitted codefendant Kamoto while also acquitting Defendant of the aggravated assault charge. As the State points out, this result is unlikely if Merino's testimony were so prejudicial that it aroused the jury to hostility or otherwise improperly influenced the jurors. Moreover, in the context of the entire three-day trial, Merino's testimony was a small part of the big picture—just thirteen pages out of the 681–page transcript, inclusive of objections and rulings.

¶ 48 Defendant has failed to demonstrate that the outcome of the trial would have been more favorable to him had the trial court excluded the improper testimony. We conclude that, even though the trial court erred by admitting some of Merino's testimony, the error does not warrant reversal of the convictions.

## IV. Cumulative Effect of the Errors

¶ 49 Defendant also argues that the cumulative effect of the errors in this case requires a new trial because it "cause[d] the jurors to disbelieve [Defendant's] defense." "A reviewing court will reverse a jury verdict under the cumulative error doctrine only if the cumulative effect of the several errors undermines . . . confidence that a fair trial was had." *State v. Gallegos*, 2009 UT 42, ¶ 39, 220 P.3d 136 (omission in original) (citation and internal quotation marks omitted). "If the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied." *State v. Gonzales*, 2005 UT 72, ¶ 74, 125 P.3d 878.

---

8. While the trial court should have limited Merino's testimony, we note that no Utah precedent has stated that gang references automatically taint juries, *see State v. Milligan*, 2010 UT App 152U, para. 6, 2010 WL 2311852 (mem.), *cert. denied*, 238 P.3d 443 (Utah 2010), although other jurisdictions have noted the negative impact of such evidence, *see, e.g., United States v. Harris*, 587 F.3d 861, 867 (7th Cir.2009) ("Evidence of gang membership can be inflammatory, with the danger being that it leads the jury to attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. . . . For that reason, we have asked district courts to consider carefully whether to admit evidence of gang membership and gang activity in criminal prosecutions.") (citation and internal quotation marks omitted).

¶ 50 We have concluded that Defendant failed to establish that the trial court's inadvertent references to the restricted person language was so prejudicial as to constitute reversible error. We also concluded that the court did not abuse its discretion by providing a curative instruction and declining to question the jurors regarding the altercation. Regarding the expert testimony, although a fair amount of the testimony was prejudicial and not relevant, we conclude that Defendant did not demonstrate that the outcome of the trial would have been more favorable to him had the court excluded the improper evidence. The remaining testimony was both relevant and highly probative; it was not unfairly prejudicial and the court did not err by admitting it. Based on our conclusions regarding the claims of error and our consideration of the cumulative effect of any error, we see no reason to reverse Defendant's conviction on the grounds of cumulative error.

¶ 51 Affirmed.

¶ 52 I CONCUR: MICHELE M. CHRISTIANSEN, Judge.

McHUGH, Associate Presiding Judge (dissenting):

¶ 53 While I agree with the majority's decision as to whether the trial court erred on each issue raised on appeal, I respectfully disagree as to the cumulative effect of the errors. Therefore, I would reverse Defendant's conviction and remand his case for a new trial on the basis of prejudicial, cumulative error.

¶ 54 As stated in the majority opinion, the standard of review for the cumulative error doctrine is that the reviewing court will only reverse "if the cumulative effect of the several errors undermines our confidence" that the defendant had a fair trial. *See State v. Gonzales*, 2005 UT 72, ¶ 74, 125 P.3d 878 (internal quotation marks omitted). "If the claims are found on appeal to not constitute error, *or the errors are found to be so minor*

*as to result in no harm,* the doctrine will not be applied." *Id.* (emphasis added).

¶ 55 First, I agree that the trial court erred when it—albeit inadvertently—referred to the "restricted person" charge and failed to remove the language from the set of instructions provided to the jury. Second, I am in agreement that the trial court acted reasonably and well within its discretion when it declined to question the jurors regarding the altercation in the hallway of the courtroom. Third, I concur in the majority's conclusion that the State's gang expert was permitted to stray far afield of probative or relevant evidence despite Defendant's objections.[1] However, unlike the majority, I am not convinced the errors were minor. Instead, the cumulative effect of these errors undermines my confidence that Defendant had a fair trial, and I would reverse and remand for a new trial.

---

1.  A trial court's task is made more difficult when overzealous experts are offered on sensitive topics. With the right to offer such testimony comes a corresponding duty to school the expert on the importance of refraining from gratuitous forays into irrelevant and potentially inflammatory embellishments. However, my review of the record suggests that the wide-ranging and colorful testimony was a product of the witness's own enthusiasm rather than any tactic of the prosecution.